# WESBERRY ET AL. *v.* SANDERS, GOVERNOR OF GEORGIA, ET AL.

No. 22.   Argued November 18–19, 1963.—Decided February 17, 1964.

2

*Frank T. Cash, pro hac vice,* by special leave of Court, and *Emmet J. Bondurant II* argued the cause for appellants. With them on the brief was *DeJongh Franklin.*

*Paul Rodgers,* Assistant Attorney General of Georgia, argued the cause for appellees. With him on the brief was *Eugene Cook,* Attorney General of Georgia.

*Bruce J. Terris,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Cox* and *Richard W. Schmude.*

Mr. Justice Black delivered the opinion of the Court.

Appellants are citizens and qualified voters of Fulton County, Georgia, and as such are entitled to vote in congressional elections in Georgia's Fifth Congressional District. That district, one of ten created by a 1931 Georgia statute,[1] includes Fulton, DeKalb, and Rockdale Counties and has a population according to the 1960 census of 823,680. The average population of the ten districts is 394,312, less than half that of the Fifth. One district, the Ninth, has only 272,154 people, less than one-third as many as the Fifth. Since there is only one Congressman for each district, this inequality of population means that the Fifth District's Congressman has to represent from two to three times as many people as do Congressmen from some of the other Georgia districts.

---

[1] Ga. Code, § 34–2301.

Claiming that these population disparities deprived them and voters similarly situated of a right under the Federal Constitution to have their votes for Congressmen given the same weight as the votes of other Georgians, the appellants brought this action under 42 U. S. C. §§ 1983 and 1988 and 28 U. S. C. § 1343 (3) asking that the Georgia statute be declared invalid and that the appellees, the Governor and Secretary of State of Georgia, be enjoined from conducting elections under it. The complaint alleged that appellants were deprived of the full benefit of their right to vote, in violation of (1) Art. I, § 2, of the Constitution of the United States, which provides that "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States . . ."; (2) the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment; and (3) that part of Section 2 of the Fourteenth Amendment which provides that "Representatives shall be apportioned among the several States according to their respective numbers . . . ."

The case was heard by a three-judge District Court, which found unanimously, from facts not disputed, that:

> "It is clear by any standard . . . that the population of the Fifth District is grossly out of balance with that of the other nine congressional districts of Georgia and in fact, so much so that the removal of DeKalb and Rockdale Counties from the District, leaving only Fulton with a population of 556,326, would leave it exceeding the average by slightly more than forty per cent." [2]

Notwithstanding these findings, a majority of the court dismissed the complaint, citing as their guide Mr. Justice Frankfurter's minority opinion in *Colegrove* v. *Green,* 328 U. S. 549, an opinion stating that challenges to appor-

---

[2] *Wesberry* v. *Vandiver,* 206 F. Supp. 276, 279–280.

tionment of congressional districts raised only "political" questions, which were not justiciable. Although the majority below said that the dismissal here was based on "want of equity" and not on nonjusticiability, they relied on no circumstances which were peculiar to the present case; instead, they adopted the language and reasoning of Mr. Justice Frankfurter's *Colegrove* opinion in concluding that the appellants had presented a wholly "political" question.[3] Judge Tuttle, disagreeing with the court's reliance on that opinion, dissented from the dismissal, though he would have denied an injunction at that time in order to give the Georgia Legislature ample opportunity to correct the "abuses" in the apportionment. He relied on *Baker* v. *Carr,* 369 U. S. 186, which, after full discussion of *Colegrove* and all the opinions in it, held that allegations of disparities of population in state legislative districts raise justiciable claims on which courts may grant relief. We noted probable jurisdiction. 374 U. S. 802. We agree with Judge Tuttle that in debasing the weight of appellants' votes the State has abridged the right to vote for members of Congress guaranteed them by the United States Constitution, that the District Court should have entered a declaratory judgment to that effect, and that it was therefore error to dismiss this suit. The question of what relief should be given we leave for further consideration and decision by the District Court in light of existing circumstances.

---

[3] "We do not deem [*Colegrove* v. *Green*] . . . to be a precedent for dismissal based on the nonjusticiability of a political question involving the Congress as here, but we do deem it to be strong authority for dismissal for want of equity when the following factors here involved are considered on balance: a political question involving a coordinate branch of the federal government; a political question posing a delicate problem difficult of solution without depriving others of the right to vote by district, unless we are to redistrict for the state; relief may be forthcoming from a properly apportioned state legislature; and relief may be afforded by the Congress." 206 F. Supp., at 285 (footnote omitted).

## I.

*Baker* v. *Carr, supra,* considered a challenge to a 1901 Tennessee statute providing for apportionment of State Representatives and Senators under the State's constitution, which called for apportionment among counties or districts "according to the number of qualified voters in each." The complaint there charged that the State's constitutional command to apportion on the basis of the number of qualified voters had not been followed in the 1901 statute and that the districts were so discriminatorily disparate in number of qualified voters that the plaintiffs and persons similarly situated were, "by virtue of the debasement of their votes," denied the equal protection of the laws guaranteed them by the Fourteenth Amendment.[4] The cause there of the alleged "debasement" of votes for state legislators—districts containing widely varying numbers of people—was precisely that which was alleged to debase votes for Congressmen in *Colegrove* v. *Green, supra,* and in the present case. The Court in *Baker* pointed out that the opinion of Mr. Justice Frankfurter in *Colegrove,* upon the reasoning of which the majority below leaned heavily in dismissing "for want of equity," was approved by only three of the seven Justices sitting.[5] After full consideration of *Colegrove,* the Court in *Baker* held (1) that the District Court had jurisdiction of the subject matter; (2) that the qualified Tennessee voters there had standing to sue; and

---

[4] 369 U. S., at 188.

[5] Mr. Justice Rutledge in *Colegrove* believed that the Court should exercise its equitable discretion to refuse relief because "The shortness of the time remaining [before the next election] makes it doubtful whether action could, or would, be taken in time to secure for petitioners the effective relief they seek." 328 U. S., at 565. In a later separate opinion he emphasized that his vote in *Colegrove* had been based on the "particular circumstances" of that case. *Cook* v. *Fortson,* 329 U. S. 675, 678.

6

(3) that the plaintiffs had stated a justiciable cause of action on which relief could be granted.

The reasons which led to these conclusions in *Baker* are equally persuasive here. Indeed, as one of the grounds there relied on to support our holding that state apportionment controversies are justiciable we said:

> ". . . *Smiley* v. *Holm,* 285 U. S. 355, *Koenig* v. *Flynn,* 285 U. S. 375, and *Carroll* v. *Becker,* 285 U. S. 380, concerned the choice of Representatives in the Federal Congress. *Smiley, Koenig* and *Carroll* settled the issue in favor of justiciability of questions of congressional redistricting. The Court followed these precedents in *Colegrove* although over the dissent of three of the seven Justices who participated in that decision." [6]

This statement in *Baker,* which referred to our past decisions holding congressional apportionment cases to be justiciable, we believe was wholly correct and we adhere to it. Mr. Justice Frankfurter's *Colegrove* opinion contended that Art. I, § 4, of the Constitution [7] had given Congress "exclusive authority" to protect the right of citizens to vote for Congressmen,[8] but we made it clear in *Baker* that nothing in the language of that article gives support to a construction that would immunize state congressional apportionment laws which debase a citizen's right to vote from the power of courts to protect the constitutional rights of individuals from legislative destruction, a power recognized at least since our decision in *Marbury* v. *Madison,* 1 Cranch 137, in 1803. Cf. *Gib-*

---

[6] 369 U. S., at 232. Cf. also *Wood* v. *Broom,* 287 U. S. 1.

[7] "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators. . . ." U. S. Const., Art. I, § 4.

[8] 328 U. S., at 554.

*bons* v. *Ogden,* 9 Wheat. 1. The right to vote is too important in our free society to be stripped of judicial protection by such an interpretation of Article I. This dismissal can no more be justified on the ground of "want of equity" than on the ground of "nonjusticiability." We therefore hold that the District Court erred in dismissing the complaint.

## II.

This brings us to the merits. We agree with the District Court that the 1931 Georgia apportionment grossly discriminates against voters in the Fifth Congressional District. A single Congressman represents from two to three times as many Fifth District voters as are represented by each of the Congressmen from the other Georgia congressional districts. The apportionment statute thus contracts the value of some votes and expands that of others. If the Federal Constitution intends that when qualified voters elect members of Congress each vote be given as much weight as any other vote, then this statute cannot stand.

We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen "by the People of the several States" [9] means that as

---

[9] "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

.        .        .        .        .

"Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Man-

8

nearly as is practicable one man's vote in a congressional election is to be worth as much as another's.[10]  This rule is followed automatically, of course, when Representatives are chosen as a group on a statewide basis, as was a widespread practice in the first 50 years of our Nation's history.[11]  It would be extraordinary to suggest that in such statewide elections the votes of inhabitants of some parts of a State, for example, Georgia's thinly populated Ninth District, could be weighted at two or three times the value of the votes of people living in more populous parts of the State, for example, the Fifth District around Atlanta.  Cf. *Gray* v. *Sanders*, 372 U. S. 368.  We do not believe that the Framers of the Constitution intended to permit the same vote-diluting discrimination to be accomplished through the device of districts containing widely varied numbers of inhabitants.  To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a House of Representatives elected "by the People," a principle tenaciously fought for and established at the Constitutional Convention.  The history of the Constitution, particularly that part of it relating to the adoption of Art. I, § 2, reveals that those who framed the Con-

---

ner as they shall by Law direct.  The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative . . . ."  U. S. Const., Art. I, § 2.

The provisions for apportioning Representatives and direct taxes have been amended by the Fourteenth and Sixteenth Amendments, respectively.

[10] We do not reach the arguments that the Georgia statute violates the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment.

[11] As late as 1842, seven States still conducted congressional elections at large.  See Paschal, "The House of Representatives: 'Grand Depository of the Democratic Principle'?"  17 Law & Contemp. Prob. 276, 281 (1952).

stitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives.

During the Revolutionary War the rebelling colonies were loosely allied in the Continental Congress, a body with authority to do little more than pass resolutions and issue requests for men and supplies. Before the war ended the Congress had proposed and secured the ratification by the States of a somewhat closer association under the Articles of Confederation. Though the Articles established a central government for the United States, as the former colonies were even then called, the States retained most of their sovereignty, like independent nations bound together only by treaties. There were no separate judicial or executive branches: only a Congress consisting of a single house. Like the members of an ancient Greek league, each State, without regard to size or population, was given only one vote in that house. It soon became clear that the Confederation was without adequate power to collect needed revenues or to enforce the rules its Congress adopted. Farsighted men felt that a closer union was necessary if the States were to be saved from foreign and domestic dangers.

The result was the Constitutional Convention of 1787, called for "the sole and express purpose of revising the Articles of Confederation . . . ." [12] When the Conven-

---

[12] 3 The Records of the Federal Convention of 1787 (Farrand ed. 1911) 14 (hereafter cited as "Farrand").

James Madison, who took careful and complete notes during the Convention, believed that in interpreting the Constitution later generations should consider the history of its adoption:

"Such were the defects, the deformities, the diseases and the ominous prospects, for which the Convention were to provide a remedy, and which ought never to be overlooked in expounding & appreciating the Constitutional Charter the remedy that was provided." *Id.*, at 549.

tion met in May, this modest purpose was soon aban-
doned for the greater challenge of creating a new and
closer form of government than was possible under the
Confederation. Soon after the Convention assembled,
Edmund Randolph of Virginia presented a plan not
merely to amend the Articles of Confederation but to
create an entirely new National Government with a Na-
tional Executive, National Judiciary, and a National
Legislature of two Houses, one house to be elected by
"the people," the second house to be elected by the first.[13]

The question of how the legislature should be consti-
tuted precipitated the most bitter controversy of the Con-
vention. One principle was uppermost in the minds of
many delegates: that, no matter where he lived, each
voter should have a voice equal to that of every other
in electing members of Congress. In support of this
principle, George Mason of Virginia

> "argued strongly for an election of the larger branch
> by the people. It was to be the grand depository of
> the democratic principle of the Govt." [14]

James Madison agreed, saying "If the power is not imme-
diately derived from the people, in proportion to their
numbers, we may make a paper confederacy, but that will
be all." [15] Repeatedly, delegates rose to make the same
point: that it would be unfair, unjust, and contrary to
common sense to give a small number of people as many
Senators or Representatives as were allowed to much
larger groups [16]—in short, as James Wilson of Pennsyl-

---

[13] 1 *id.,* at 20.

[14] *Id.,* at 48.

[15] *Id.,* at 472.

[16] See, *e. g., id.,* at 197–198 (Benjamin Franklin of Pennsylvania);
*id.,* at 467 (Elbridge Gerry of Massachusetts); *id.,* at 286, 465–466
(Alexander Hamilton of New York); *id.,* at 489–490 (Rufus King of
Massachusetts); *id.,* at 322, 446–449, 486, 527–528 (James Madison
of Virginia); *id.,* at 180, 456 (Hugh Williamson of North Carolina);
*id.,* at 253–254, 406, 449–450, 482–484 (James Wilson of Pennsylvania).

vania put it, "equal numbers of people ought to have an equal no. of representatives . . ." and representatives "of different districts ought clearly to hold the same proportion to each other, as their respective constituents hold to each other." [17]

Some delegates opposed election by the people. The sharpest objection arose out of the fear on the part of small States like Delaware that if population were to be the only basis of representation the populous States like Virginia would elect a large enough number of representatives to wield overwhelming power in the National Government.[18] Arguing that the Convention had no authority to depart from the plan of the Articles of Confederation which gave each State an equal vote in the National Congress, William Paterson of New Jersey said, "If the sovereignty of the States is to be maintained, the Representatives must be drawn immediately from the States, not from the people: and we have no power to vary the idea of equal sovereignty." [19] To this end he proposed a single legislative chamber in which each State, as in the Confederation, was to have an equal vote.[20] A number of delegates supported this plan.[21]

The delegates who wanted every man's vote to count alike were sharp in their criticism of giving each State,

---

[17] *Id.*, at 180.

[18] Luther Martin of Maryland declared

"that the States being equal cannot treat or confederate so as to give up an equality of votes without giving up their liberty: that the propositions on the table were a system of slavery for 10 States: that as Va. Masts. & Pa. have 42/90 of the votes they can do as they please without a miraculous Union of the other ten: that they will have nothing to do, but to gain over one of the ten to make them compleat masters of the rest . . . ." *Id.*, at 438.

[19] *Id.*, at 251.

[20] 3 *id.*, at 613.

[21] *E. g.*, 1 *id.*, at 324 (Alexander Martin of North Carolina); *id.*, at 437–438, 439–441, 444–445, 453–455 (Luther Martin of Maryland); *id.*, at 490–492 (Gunning Bedford of Delaware).

regardless of population, the same voice in the National Legislature. Madison entreated the Convention "to renounce a principle wch. was confessedly unjust," [22] and Rufus King of Massachusetts "was prepared for every event, rather than sit down under a Govt. founded in a vicious principle of representation and which must be as shortlived as it would be unjust." [23]

The dispute came near ending the Convention without a Constitution. Both sides seemed for a time to be hopelessly obstinate. Some delegations threatened to withdraw from the Convention if they did not get their way.[24] Seeing the controversy growing sharper and emotions rising, the wise and highly respected Benjamin Franklin arose and pleaded with the delegates on both sides to "part with some of their demands, in order that they may join in some accomodating proposition." [25] At last those who supported representation of the people in both houses and those who supported it in neither were brought together, some expressing the fear that if they did not reconcile their differences, "some foreign sword will probably do the work for us." [26] The deadlock was finally broken when a majority of the States agreed to what has been called the Great Compromise,[27] based on a proposal which had been repeatedly advanced by Roger

---

[22] *Id.*, at 464.

[23] *Id.*, at 490.

[24] Gunning Bedford of Delaware said:

"We have been told (with a dictatorial air) that this is the last moment for a fair trial in favor of a good Governmt. . . . The Large States dare not dissolve the confederation. If they do the small ones will find some foreign ally of more honor and good faith, who will take them by the hand and do them justice." *Id.*, at 492.

[25] *Id.*, at 488.

[26] *Id.*, at 532 (Elbridge Gerry of Massachusetts). George Mason of Virginia urged an "accomodation" as "preferable to an appeal to the world by the different sides, as had been talked of by some Gentlemen." *Id.*, at 533.

[27] See *id.*, at 551.

Sherman and other delegates from Connecticut.[28] It provided on the one hand that each State, including little Delaware and Rhode Island, was to have two Senators. As a further guarantee that these Senators would be considered state emissaries, they were to be elected by the state legislatures, Art. I, § 3, and it was specially provided in Article V that no State should ever be deprived of its equal representation in the Senate. The other side of the compromise was that, as provided in Art. I, § 2, members of the House of Representatives should be chosen "by the People of the several States" and should be "apportioned among the several States . . . according to their respective Numbers." While those who wanted both houses to represent the people had yielded on the Senate, they had not yielded on the House of Representatives. William Samuel Johnson of Connecticut had summed it up well: "in *one* branch the *people,* ought to be represented; in the *other,* the *States.*" [29]

The debates at the Convention make at least one fact abundantly clear: that when the delegates agreed that the House should represent "people" they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants.[30] The Constitution embodied Edmund Randolph's proposal for a periodic census to ensure "fair representation of the people," [31] an idea endorsed by Mason as assuring that "numbers of inhabitants"

---

[28] See *id.,* at 193, 342–343 (Roger Sherman); *id.,* at 461–462 (William Samuel Johnson).

[29] *Id.,* at 462. (Emphasis in original.)

[30] While "free Persons" and those "bound to Service for a Term of Years" were counted in determining representation, Indians not taxed were not counted, and "three fifths of all other Persons" (slaves) were included in computing the States' populations. Art. I, § 2. Also, every State was to have "at Least one Representative." *Ibid.*

[31] 1 Farrand, at 580.

14

should always be the measure of representation in the House of Representatives.[32]  The Convention also overwhelmingly agreed to a resolution offered by Randolph to base future apportionment squarely on numbers and to delete any reference to wealth.[33]  And the delegates defeated a motion made by Elbridge Gerry to limit the number of Representatives from newer Western States so that it would never exceed the number from the original States.[34]

It would defeat the principle solemnly embodied in the Great Compromise—equal representation in the House for equal numbers of people—for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others. The House of Representatives, the Convention agreed, was to represent the people as individuals, and on a basis of complete equality for each voter.  The delegates were quite aware of what Madison called the "vicious representation" in Great Britain [35] whereby "rotten boroughs" with few inhabitants were represented in Parliament on or almost on a par with cities of greater population.  Wilson urged that people must be represented as individuals, so that America would escape·

_____

[32] *Id.*, at 579.

[33] *Id.*, at 606.  Those who thought that one branch should represent wealth were told by Roger Sherman of Connecticut that the "number of people alone [was] the best rule for measuring wealth as well as representation; and that if the Legislature were to be governed by wealth, they would be obliged to estimate it by numbers." *Id.*, at 582.

[34] 2 *id.*, at 3.  The rejected thinking of those who supported the proposal to limit western representation is suggested by the statement of Gouverneur Morris of Pennsylvania that "The Busy haunts of men not the remote wilderness, was the proper School of political Talents."  1 *id.*, at 583.

[35] *Id.*, at 464.

the evils of the English system under which one man could send two members to Parliament to represent the borough of Old Sarum while London's million people sent but four.[36]  The delegates referred to rotten borough apportionments in some of the state legislatures as the kind of objectionable governmental action that the Constitution should not tolerate in the election of congressional representatives.[37]

Madison in *The Federalist* described the system of division of States into congressional districts, the method which he and others [38] assumed States probably would adopt: "The city of Philadelphia is supposed to contain between fifty and sixty thousand souls.  It will therefore form nearly two districts for the choice of Fœderal Representatives." [39]  "[N]umbers," he said, not only are a suitable way to represent wealth but in any event "are the only proper scale of representation." [40]  In the state conventions, speakers urging ratification of the Constitution emphasized the theme of equal representation in the House which had permeated the debates in Phila-

---

[36] *Id.*, at 457.  "Rotten boroughs" have long since disappeared in Great Britain.  Today permanent parliamentary Boundary Commissions recommend periodic changes in the size of constituencies, as population shifts.  For the statutory standards under which these commissions operate, see House of Commons (Redistribution of Seats) Acts of 1949, 12 & 13 Geo. 6, c. 66, Second Schedule, and of 1958, 6 & 7 Eliz. 2, c. 26, Schedule.

[37] 2 *id.*, at 241.

[38] See, *e. g.*, 2 Works of Alexander Hamilton (Lodge ed. 1904) 25 (statement to New York ratifying convention).

[39] The Federalist, No. 57 (Cooke ed. 1961), at 389.

[40] *Id.*, No. 54, at 368.  There has been some question about the authorship of Numbers 54 and 57, see The Federalist (Lodge ed. 1908) xxiii–xxxv, but it is now generally believed that Madison was the author, see, *e. g.*, The Federalist (Cooke ed. 1961) xxvii; The Federalist (Van Doren ed. 1945) vi–vii; Brant, "Settling the Authorship of *The Federalist*," 67 Am. Hist. Rev. 71 (1961).

delphia.[41] Charles Cotesworth Pinckney told the South Carolina Convention, "the House of Representatives will be elected immediately by the people, and represent them and their personal rights individually . . . ."[42] Speakers at the ratifying conventions emphasized that the House of Representatives was meant to be free of the malapportionment then existing in some of the state legislatures—such as those of Connecticut, Rhode Island, and South Carolina—and argued that the power given Congress in Art. I, § 4,[43] was meant to be used to vindicate the people's right to equality of representation in the House.[44] Congress' power, said John Steele at the North Carolina convention, was not to be used to allow Congress to create rotten boroughs; in answer to another delegate's suggestion that Congress might use its power to favor people living near the seacoast, Steele said that Congress "most probably" would "lay the state off into districts," and if it made laws "inconsistent with the Constitution, independent judges will not uphold them, nor will the people obey them."[45]

---

[41] See, e. g., 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution (2d Elliot ed. 1836) 11 (Fisher Ames, in the Massachusetts Convention) (hereafter cited as "Elliot"); id., at 202 (Oliver Wolcott, Connecticut); 4 id., at 21 (William Richardson Davie, North Carolina); id., at 257 (Charles Pinckney, South Carolina).

[42] Id., at 304.

[43] "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators. . . ." U. S. Const., Art. I, § 4.

[44] See 2 Elliot, at 49 (Francis Dana, in the Massachusetts Convention); id., at 50–51 (Rufus King, Massachusetts); 3 id., at 367 (James Madison, Virginia).

[45] 4 id., at 71.

Soon after the Constitution was adopted, James Wilson of Pennsylvania, by then an Associate Justice of this Court, gave a series of lectures at Philadelphia in which, drawing on his experience as one of the most active members of the Constitutional Convention, he said:

"[A]ll elections ought to be equal. Elections are equal, when a given number of citizens, in one part of the state, choose as many representatives, as are chosen by the same number of citizens, in any other part of the state. In this manner, the proportion of the representatives and of the constituents will remain invariably the same." [46]

It is in the light of such history that we must construe Art. I, § 2, of the Constitution, which, carrying out the ideas of Madison and those of like views, provides that Representatives shall be chosen "by the People of the several States" and shall be "apportioned among the several States . . . according to their respective Numbers." It is not surprising that our Court has held that this Article gives persons qualified to vote a constitutional right to vote and to have their votes counted. *United States* v. *Mosley,* 238 U. S. 383; *Ex Parte Yarbrough,* 110 U. S. 651. Not only can this right to vote not be denied outright, it cannot, consistently with Article I, be destroyed by alteration of ballots, see *United States* v. *Classic,* 313 U. S. 299, or diluted by stuffing of the ballot box, see *United States* v. *Saylor,* 322 U. S. 385. No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges

---

[46] 2 The Works of James Wilson (Andrews ed. 1896) 15.

this right.   In urging the people to adopt the Constitution, Madison said in No. 57 of *The Federalist:*

> "Who are to be the electors of the Fœderal Representatives?   Not the rich more than the poor; not the learned more than the ignorant; not the haughty heirs of distinguished names, more than the humble sons of obscure and unpropitious fortune.   The electors are to be the great body of the people of the United States. . . ." [47]

Readers surely could have fairly taken this to mean, "one person, one vote."   Cf. *Gray* v. *Sanders,* 372 U. S. 368, 381.

While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us.

*Reversed and remanded.*

Mr. Justice Clark, concurring in part and dissenting in part.

Unfortunately I can join neither the opinion of the Court nor the dissent of my Brother Harlan.   It is true that the opening sentence of Art. I, § 2, of the Constitution provides that Representatives are to be chosen "by the People of the several States . . . ."   However, in my view, Brother Harlan has clearly demonstrated that both the historical background and language preclude a finding that Art. I, § 2, lays down the *ipse dixit* "one person, one vote" in congressional elections.

On the other hand, I agree with the majority that congressional districting is subject to judicial scrutiny.   This

---

[47] The Federalist, No. 57 (Cooke ed. 1961), at 385.

Court has so held ever since *Smiley* v. *Holm,* 285 U. S. 355 (1932), which is buttressed by two companion cases, *Koenig* v. *Flynn,* 285 U. S. 375 (1932), and *Carroll* v. *Becker,* 285 U. S. 380 (1932). A majority of the Court in *Colegrove* v. *Green* felt, upon the authority of *Smiley,* that the complaint presented a justiciable controversy not reserved exclusively to Congress. *Colegrove* v. *Green,* 328 U. S. 549, 564, and 568, n. 3 (1946). Again, in *Baker* v. *Carr,* 369 U. S. 186, 232 (1962), the opinion of the Court recognized that *Smiley* "settled the issue in favor of justiciability of questions of congressional redistricting." I therefore cannot agree with Brother HARLAN that the supervisory power granted to Congress under Art. I, § 4, is the exclusive remedy.

I would examine the Georgia congressional districts against the requirements of the Equal Protection Clause of the Fourteenth Amendment. As my Brother BLACK said in his dissent in *Colegrove* v. *Green, supra,* the "equal protection clause of the Fourteenth Amendment forbids . . . discrimination. It does not permit the States to pick out certain qualified citizens or groups of citizens and deny them the right to vote at all. . . . No one would deny that the equal protection clause would also prohibit a law that would expressly give certain citizens a half-vote and others a full vote. . . . Such discriminatory legislation seems to me exactly the kind that the equal protection clause was intended to prohibit." At 569.

The trial court, however, did not pass upon the merits of the case, although it does appear that it did make a finding that the Fifth District of Georgia was "grossly out of balance" with other congressional districts of the State. Instead of proceeding on the merits, the court dismissed the case for lack of equity. I believe that the court erred in so doing. In my view we should therefore vacate this judgment and remand the case for a hearing

on the merits. At that hearing the court should apply the standards laid down in *Baker* v. *Carr, supra.*

I would enter an additional caveat. The General Assembly of the Georgia Legislature has been recently reapportioned * as a result of the order of the three-judge District Court in *Toombs* v. *Fortson,* 205 F. Supp. 248 (1962). In addition, the Assembly has created a Joint Congressional Redistricting Study Committee which has been working on the problem of congressional redistricting for several months. The General Assembly is currently in session. If on remand the trial court is of the opinion that there is likelihood of the General Assembly's reapportioning the State in an appropriate manner, I believe that coercive relief should be deferred until after the General Assembly has had such an opportunity.

Mr. Justice Harlan, dissenting.

I had not expected to witness the day when the Supreme Court of the United States would render a decision which casts grave doubt on the constitutionality of the composition of the House of Representatives. It is not an exaggeration to say that such is the effect of today's decision. The Court's holding that the Constitution requires States to select Representatives either by elections at large or by elections in districts composed "as nearly as is practicable" of equal population places in jeopardy the seats of almost all' the members of the present House of Representatives.

In the last congressional election, in 1962, Representatives from 42 States were elected from congressional districts.[1] In all but five of those States, the difference be-

---

*Georgia Laws, Sept.–Oct. 1962, Extra. Sess. 7–31.

[1] Representatives were elected at large in Alabama (8), Alaska (1), Delaware (1), Hawaii (2), Nevada (1), New Mexico (2), Vermont (1), and Wyoming (1). In addition, Connecticut, Maryland, Michigan, Ohio, and Texas each elected one of their Representatives at large.

tween the populations of the largest and smallest districts exceeded 100,000 persons.[2] A difference of this magnitude in the size of districts the average population of which in each State is less than 500,000 [3] is presumably not equality among districts "as nearly as is practicable," although the Court does not reveal its definition of that phrase.[4] Thus, today's decision impugns the validity of the election of 398 Representatives from 37 States, leaving a "constitutional" House of 37 members now sitting.[5]

---

[2] The five States are Iowa, Maine, New Hampshire, North Dakota, and Rhode Island. Together, they elect 15 Representatives.

The populations of the largest and smallest districts in each State and the difference between them are contained in an Appendix to this opinion.

[3] The only State in which the average population per district is greater than 500,000 is Connecticut, where the average population per district is 507,047 (one Representative being elected at large). The difference between the largest and smallest districts in Connecticut is, however, 370,613.

[4] The Court's "as nearly as is practicable" formula sweeps a host of questions under the rug. How great a difference between the populations of various districts within a State is tolerable? Is the standard an absolute or relative one, and if the latter to what is the difference in population to be related? Does the number of districts within the State have any relevance? Is the number of voters or the number of inhabitants controlling? Is the relevant statistic the greatest disparity between any two districts in the State or the average departure from the average population per district, or a little of both? May the State consider factors such as area or natural boundaries (rivers, mountain ranges) which are plainly relevant to the practicability of effective representation?

There is an obvious lack of criteria for answering questions such as these, which points up the impropriety of the Court's wholehearted but heavy-footed entrance into the political arena.

[5] The 37 "constitutional" Representatives are those coming from the eight States which elected their Representatives at large (plus one each elected at large in Connecticut, Maryland, Michigan, Ohio, and Texas) and those coming from States in which the difference between the populations of the largest and smallest districts was less

Only a demonstration which could not be avoided would justify this Court in rendering a decision the effect of which, inescapably as I see it, is to declare constitutionally defective the very composition of a coordinate branch of the Federal Government. The Court's opinion not only fails to make such a demonstration, it is unsound logically on its face and demonstrably unsound historically.

## I.

Before coming to grips with the reasoning that carries such extraordinary consequences, it is important to have firmly in mind the provisions of Article I of the Constitution which control this case:

"Section 2. The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

.        .        .        .        .

---

than 100,000. See notes 1 and 2, *supra*. Since the difference between the largest and smallest districts in Iowa is 89,250, and the average population per district in Iowa is only 393,934, Iowa's 7 Representatives might well lose their seats as well. This would leave a House of Representatives composed of the 22 Representatives elected at large plus eight elected in congressional districts.

These conclusions presume that all the Representatives from a State in which any part of the congressional districting is found invalid would be affected. Some of them, of course, would ordinarily come from districts the populations of which were about that which would result from an apportionment based solely on population. But a court cannot erase only the districts which do not conform to the standard announced today, since invalidation of those districts would require that the lines of all the districts within the State be redrawn. In the absence of a reapportionment, *all* the Representatives from a State found to have violated the standard would presumably have to be elected at large.

"Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons. The actual Enumeration shall be made within three Years after the first Meeting of the Congress of the United States, and within every subsequent Term of ten Years, in such Manner as they shall by Law direct. The Number of Representatives shall not exceed one for every thirty Thousand, but each State shall have at Least one Representative . . . .

"Section 4. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

.  .  .  .  .

"Section 5. Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members . . . ."

As will be shown, these constitutional provisions and their "historical context," *ante*, p. 7, establish:

1. that congressional Representatives are to be apportioned among the several States largely, but not entirely, according to population;

2. that the States have plenary power to select their allotted Representatives in accordance with any method of popular election they please, subject only to the supervisory power of Congress; and

3. that the supervisory power of Congress is exclusive.

In short, in the absence of legislation providing for equal districts by the Georgia Legislature or by Congress, these appellants have no right to the judicial relief which they seek. It goes without saying that it is beyond the province of this Court to decide whether equally populated districts is the preferable method for electing Representatives, whether state legislatures would have acted more fairly or wisely had they adopted such a method, or whether Congress has been derelict in not requiring state legislatures to follow that course. Once it is clear that there is no *constitutional* right at stake, that ends the case.

## II.

Disclaiming all reliance on other provisions of the Constitution, in particular those of the Fourteenth Amendment on which the appellants relied below and in this Court, the Court holds that the provision in Art. I, § 2, for election of Representatives "by the People" *means* that congressional districts are to be "as nearly as is practicable" equal in population, *ante,* pp. 7–8. Stripped of rhetoric and a "historical context," *ante,* p. 7, which bears little resemblance to the evidence found in the pages of history, see *infra,* pp. 30–41, the Court's opinion supports its holding only with the bland assertion that "the principle of a House of Representatives elected 'by the People' " would be "cast aside" if "a vote is worth more in one district than in another," *ante,* p. 8, *i. e.,* if congressional districts within a State, each electing a single Representative, are not equal in population. The fact is, however, that Georgia's 10 Representatives *are* elected "by the People" of Georgia, just as Representatives from other States are elected "by the People of the several States." This is all that the Constitution requires.[6]

---

[6] Since I believe that the Constitution expressly provides that state legislatures and the Congress shall have exclusive jurisdiction

Although the Court finds necessity for its artificial construction of Article I in the undoubted importance of the right to vote, that right is not involved in this case. All of the appellants do vote. The Court's talk about "debasement" and "dilution" of the vote is a model of circular reasoning, in which the premises of the argument feed on the conclusion. Moreover, by focusing exclusively on numbers in disregard of the area and shape of a congressional district as well as party affiliations within the district, the Court deals in abstractions which will be recognized even by the politically unsophisticated to have little relevance to the realities of political life.

In any event, the very sentence of Art. I, § 2, on which the Court exclusively relies confers the right to vote for Representatives only on those whom *the State* has found qualified to vote for members of "the most numerous Branch of the State Legislature." *Supra,* p. 22. So far as Article I is concerned, it is within the State's power to confer that right only on persons of wealth or of a particular sex or, if the State chose, living in specified areas of the State.[7] Were Georgia to find the residents of the

over problems of congressional apportionment of the kind involved in this case, there is no occasion for me to consider whether, in the absence of such provision, other provisions of the Constitution, relied on by the appellants, would confer on them the rights which they assert.

[7] Although it was held in *Ex parte Yarbrough,* 110 U. S. 651, and subsequent cases, that the right to vote for a member of Congress depends on the Constitution, the opinion noted that the legislatures of the States prescribe the qualifications for electors of the legislatures and thereby for electors of the House of Representatives. 110 U. S., at 663. See *ante,* p. 17, and *infra,* pp. 45–46.

The States which ratified the Constitution exercised their power. A property or taxpaying qualification was in effect almost everywhere. See, *e. g.,* the New York Constitution of 1777, Art. VII, which restricted the vote to freeholders "possessing a freehold of the value of twenty pounds, . . . or [who] have rented a tenement . . . of the

Fifth District unqualified to vote for Representatives to the State House of Representatives, they could not vote for Representatives to Congress, according to the express words of Art. I, § 2. Other provisions of the Constitution would, of course, be relevant, *but, so far as Art. I, § 2, is concerned,* the disqualification would be within Georgia's power. How can it be, then, that this very same sentence prevents Georgia from apportioning its Representatives as it chooses? The truth is that it does not.

The Court purports to find support for its position in the third paragraph of Art. I, § 2, which provides for the apportionment of Representatives among the States. The appearance of support in that section derives from the Court's confusion of two issues: direct election of Representatives within the States and the apportionment of Representatives among the States. Those issues are distinct, and were separately treated in the Constitution. The fallacy of the Court's reasoning in this regard is illustrated by its slide, obscured by intervening discussion (see *ante,* pp. 13–14), from the intention of the delegates at the Philadelphia Convention "that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants," *ante,* p. 13, to a "principle solemnly embodied in the Great Compromise—equal representation in the House for equal numbers of people," *ante,* p. 14. The delegates did have the former intention and made clear

yearly value of forty shillings, and been rated and actually paid taxes to this State." The constitutional and statutory qualifications for electors in the various States are set out in tabular form in 1 Thorpe, A Constitutional History of the American People 1776–1850 (1898), 93–96. The progressive elimination of the property qualification is described in Sait, American Parties and Elections (Penniman ed., 1952), 16–17. At the time of the Revolution, "no serious inroads had yet been made upon the privileges of property, which, indeed, maintained in most states a second line of defense in the

provision for it.[8]   Although many, perhaps most, of them also believed generally—but assuredly not in the precise, formalistic way of the majority of the Court [9]—that within the States representation should be based on population, they did not surreptitiously slip their belief into the Constitution in the phrase "by the People," to be discovered 175 years later like a Shakespearian anagram.

Far from supporting the Court, the apportionment of Representatives among the States shows how blindly the Court has marched to its decision.   Representatives were to be apportioned among the States on the basis of free population plus three-fifths of the slave population. Since no slave voted, the inclusion of three-fifths of their number in the basis of apportionment gave the favored States representation far in excess of their voting population.   If, then, slaves were intended to be without representation, Article I did exactly what the Court now says it prohibited: it "weighted" the vote of voters in the slave States.   Alternatively, it might have been thought that Representatives elected by free men of a State would speak also for the slaves.   But since the slaves added to the representation only of their own State, Representa-

form of high personal-property qualifications required for membership in the legislature."   *Id.*, at 16 (footnote omitted).

Women were not allowed to vote.   Thorpe, *op. cit., supra,* 93–96. See generally Sait, *op. cit., supra,* 49–54.   New Jersey apparently allowed women, as "inhabitants," to vote until 1807.   See Thorpe, *op. cit., supra,* 93.   Compare N. J. Const., 1776, Art. XIII, with N. J. Const., 1844, Art. II, ¶ 1.

[8] Even that is not strictly true unless the word "solely" is deleted. The "three-fifths compromise" was a departure from the principle of representation according to the number of inhabitants of a State. Cf. The Federalist, No. 54, discussed *infra,* pp. 39–40.   A more obvious departure was the provision that each State shall have a Representative regardless of its population.   See *infra,* pp. 28–29.

[9] The fact that the delegates were able to agree on a Senate composed entirely without regard to population and on the departures from a population-based House, mentioned in note 8, *supra,* indicates

tives from the slave States could have been thought to speak only for the slaves of their own States, indicating both that the Convention believed it possible for a Representative elected by one group to speak for another non-voting group and that Representatives were in large degree still thought of as speaking for the whole population of a State.[10]

There is a further basis for demonstrating the hollowness of the Court's assertion that Article I requires "one man's vote in a congressional election . . . to be worth as much as another's," *ante*, p. 8. Nothing that the Court does today will disturb the fact that although in 1960 the population of an average congressional district was 410,481,[11] the States of Alaska, Nevada, and Wyo-

---

that they recognized the possibility that alternative principles combined with political reality might dictate conclusions inconsistent with an abstract principle of absolute numerical equality.

On the apportionment of the state legislatures at the time of the Constitutional Convention, see Luce, Legislative Principles (1930), 331–364; Hacker, Congressional Districting (1963), 5.

[10] It is surely beyond debate that the Constitution did not require the slave States to apportion their Representatives according to the dispersion of slaves within their borders. The above implications of the three-fifths compromise were recognized by Madison. See The Federalist, No. 54, discussed *infra*, pp. 39–40.

Luce points to the "quite arbitrary grant of representation proportionate to three fifths of the number of slaves" as evidence that even in the House "the representation of men as men" was not intended. He states: "There can be no shadow of question that populations were accepted as a measure of material interests—landed, agricultural, industrial, commercial, in short, property." Legislative Principles (1930), 356–357.

[11] U. S. Bureau of the Census, Census of Population: 1960 (hereafter, Census), xiv. The figure is obtained by dividing the population base (which excludes the population of the District of Columbia, the population of the Territories, and the number of Indians not taxed) by the number of Representatives. In 1960, the population base was 178,559,217, and the number of Representatives was 435.

ming each have a Representative in Congress, although their respective populations are 226,167, 285,278, and 330,066.[12] In entire disregard of population, Art. I, § 2, guarantees each of these States and every other State "at Least one Representative." It is whimsical to assert in the face of this guarantee that an absolute principle of "equal representation in the House for equal numbers of people" is "solemnly embodied" in Article I. All that there is is a provision which bases representation in the House, generally but not entirely, on the population of the States. The provision for representation of · *each State* in the House of Representatives is not a mere exception to the principle framed by the majority; it shows that no such principle is to be found.

Finally in this array of hurdles to its decision which the Court surmounts only by knocking them down is § 4 of Art. I which states simply:

> "The Times, Places and *Manner* of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." (Emphasis added.)

The delegates were well aware of the problem of "rotten boroughs," as material cited by the Court, *ante,* pp. 14–15, and hereafter makes plain. It cannot be supposed that delegates to the Convention would have labored to establish a principle of equal representation only to bury it, one would have thought beyond discovery, in § 2, and omit all mention of it from § 4, which deals explicitly with the conduct of elections. Section 4 states without qualification that the state legislatures shall prescribe regulations for the conduct of elections for Representatives and, equally without qualification, that Congress may make or

---

[12] Census, 1–16.

alter such regulations. There is nothing to indicate any limitation whatsoever on this grant of plenary initial and supervisory power. The Court's holding is, of course, derogatory not only of the power of the state legislatures but also of the power of Congress, both theoretically and as they have actually exercised their power. See *infra,* pp. 42–45.[13] It freezes upon both, for no reason other than that it seems wise to the majority of the present Court, a particular political theory for the selection of Representatives.

## III.

There is dubious propriety in turning to the "historical context" of constitutional provisions which speak so consistently and plainly. But, as one might expect when the Constitution itself is free from ambiguity, the surrounding history makes what is already clear even clearer.

As the Court repeatedly emphasizes, delegates to the Philadelphia Convention frequently expressed their view that representation should be based on population. There were also, however, many statements favoring limited monarchy and property qualifications for suffrage and expressions of disapproval for unrestricted democracy.[14] Such expressions prove as little on one side of this case as they do on the other. Whatever the dominant political philosophy at the Convention, one thing seems clear: it is in the last degree unlikely that most or even many of the delegates would have subscribed to the

---

[13] Section 5 of Article I, which provides that "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members," also points away from the Court's conclusion. This provision reinforces the evident constitutional scheme of leaving to the Congress the protection of federal interests involved in the selection of members of the Congress.

[14] I Farrand, Records of the Federal Convention (1911) (hereafter Farrand), 48, 86–87, 134–136, 288–289, 299, 533, 534; II Farrand 202.

principle of "one person, one vote," *ante,* p. 18.[15]   More-
over, the statements approving population-based repre-
sentation were focused on the problem of how repre-
sentation should be apportioned among the States in
the House of Representatives.   The Great Compromise
concerned representation *of the States* in the Congress.
In all of the discussion surrounding the basis of repre-
sentation of the House and all of the discussion whether
Representatives should be elected by the legislatures or
the people of the States, there is nothing which suggests

---

[15] "The assemblage at the Philadelphia Convention was by no
means committed to popular government, and few of the delegates
had sympathy for the habits or institutions of democracy.   Indeed,
most of them interpreted democracy as mob rule and assumed that
equality of representation would permit the spokesmen for the com-
mon man to outvote the beleaguered deputies of the uncommon man."
Hacker, Congressional Districting (1963), 7–8. See Luce, Legisla-
tive Principles (1930), 356–357.  With respect to apportionment of
the House, Luce states: "Property was the basis, not humanity."
*Id.,* at 357.

Contrary to the Court's statement, *ante,* p. 18, no reader of The
Federalist "could have fairly taken . . . [it] to mean" that the
Constitutional Convention had adopted a principle of "one person,
one vote" in contravention of the qualifications for electors which
the States imposed.   In No. 54, Madison said: "It is a fundamental
principle of the proposed Constitution, that as the aggregate num-
ber of representatives allotted to the several States, is to be deter-
mined by a fœderal rule founded on the aggregate number of inhab-
itants, *so the right of choosing this allotted number in each State is
to be exercised by such part of the inhabitants, as the State itself
may designate.* . . .  In every State, a certain proportion of in-
habitants are deprived of this right by the Constitution of the State,
who will be included in the census by which the Fœderal Constitution
apportions the representatives."   (Cooke ed. 1961) 369.   (Italics
added.)   The passage from which the Court quotes, *ante,* p. 18,
concludes with the following, overlooked by the Court: "They [the
electors] are to be the same who exercise the right in every State of
electing the correspondent branch of the Legislature of the State."
*Id.,* at 385.

even remotely that the delegates had in mind the problem of districting within a State.[16]

The subject of districting within the States is discussed explicitly with reference to the provisions of Art. I, § 4, which the Court so pointedly neglects. The Court states: "The delegates referred to rotten borough apportionments in some of the state legislatures as the kind of objectionable governmental action that the Constitution should not tolerate in the election of congressional representatives." *Ante,* p. 15. The remarks of Madison cited by the Court are as follows:

"The necessity of a Genl. Govt. supposes that the State Legislatures will sometimes fail or refuse to consult the common interest at the expense of their local conveniency or prejudices. The policy of referring the appointment of the House of Representatives to the people and not to the Legislatures of the States, supposes that the result will be somewhat influenced by the mode, [*sic.*] This view of the question seems to decide that the Legislatures of the States ought not to have the uncontrouled right of regulating the times places & manner of holding elections. These were words of great latitude. It was impossible to foresee all the abuses that might be made of the discretionary power. Whether the electors should vote by ballot or viva voce, should assemble at this place or that place; should be divided into districts or all meet at one place, shd all vote for all the representatives; or all in a district vote for a number allotted to the district; *these & many other points would depend on the Legislatures.* [*sic*] and might materially affect the appointments.

---

[16] References to Old Sarum (*ante,* p. 15), for example, occurred during the debate on the method of apportionment of Representatives *among* the States. I Farrand 449–450, 457.

Whenever the State Legislatures had a favorite measure to carry, they would take care so to mould their regulations as to favor the candidates they wished to succeed. Besides, the inequality of the Representation in the Legislatures of particular States, would produce a like inequality in their representation in the Natl. Legislature, as it was presumable that the Counties having the power in the former case would secure it to themselves in the latter. *What danger could there be in giving a controuling power to the Natl. Legislature?"* [17] (Emphasis added.)

These remarks of Madison were in response to a proposal to strike out the provision for congressional supervisory power over the regulation of elections in Art. I, § 4. Supported by others at the Convention,[18] and not contradicted in any respect, they indicate as clearly as may be that the Convention understood the state legislatures to have plenary power over the conduct of elections for Representatives, including the power to district well or badly, subject only to the supervisory power of Congress. How, then, can the Court hold that Art. I, § 2, prevents the state legislatures from districting as they choose? If the Court were correct, Madison's remarks would have been pointless. One would expect, at the very least, some reference to Art. I, § 2, as a limiting factor on the States. This is the "historical context" which the Convention debates provide.

Materials supplementary to the debates are as unequivocal. In the ratifying conventions, there was no suggestion that the provisions of Art. I, § 2, restricted the power of the States to prescribe the conduct of elections conferred on them by Art. I, § 4. None of the Court's ref-

---

[17] II Farrand 240–241.
[18] *Ibid.*

34

erences to the ratification debates supports the view that the provision for election of Representatives "by the People" was intended to have any application to the apportionment of Representatives within the States; in each instance, the cited passage merely repeats what the Constitution itself provides: that Representatives were to be elected by the people of the States.[19]

In sharp contrast to this unanimous silence on the issue of this case when Art. I, § 2, was being discussed, there are repeated references to apportionment and related problems affecting the States' selection of Representatives in connection with Art. I, § 4. The debates in the ratifying conventions, as clearly as Madison's statement at the Philadelphia Convention, *supra*, pp. 32–33, indicate that under § 4, the state legislatures, subject only to the ultimate control of Congress, could district as they chose.

At the Massachusetts convention, Judge Dana approved § 4 because it gave Congress power to prevent a state legislature from copying Great Britain, where "a borough of but two or three cottages has a right to send two representatives to *Parliament*, while Birmingham, a large and populous manufacturing town, lately sprung up, cannot send one."[20] He noted that the Rhode Island Legislature was "about adopting" a plan which would

---

[19] See the materials cited in notes 41–42, 44–45 of the Court's opinion, *ante*, p. 16. Ames' remark at the Massachusetts convention is typical: "The representatives are to represent the people." II Elliot's Debates on the Federal Constitution (2d ed. 1836) (hereafter Elliot's Debates), 11. In the South Carolina Convention, Pinckney stated that the House would "be so chosen as to represent in due proportion the people of the Union . . . ." IV Elliot's Debates 257. But he had in mind only that other clear provision of the Constitution that representation would be apportioned *among* the States according to population. None of his remarks bears on apportionment *within* the States. *Id.*, at 256–257.

[20] II Elliot's Debates 49.

"deprive the towns of Newport and Providence of their weight." [21]  Mr. King noted the situation in Connecticut, where "Hartford, one of their largest towns, sends no more delegates than one of their smallest corporations," and in South Carolina: "The back parts of Carolina have increased greatly since the adoption of their constitution, and have frequently attempted an alteration of this unequal mode of representation but the members from Charleston, having the balance so much in their favor, will not consent to an alteration, and we see that the delegates from Carolina in Congress have always been chosen by the delegates of that city." [22]  King stated that the power of Congress under § 4 was necessary to "control in this case"; otherwise, he said, "The representatives . . . from that state [South Carolina], will not be chosen *by the people*, but will be the representatives of a faction of that state." [23]

Mr. Parsons was as explicit.

"Mr. PARSONS contended for vesting in Congress the powers contained in the 4th section [of Art. I], not only as those powers were necessary for preserving the union, but also for securing to the people their equal rights of election. . . . [State legislatures] might make an unequal and partial division of the states into districts for the election of representatives, or they might even disqualify one third of the electors. Without these powers in Congress, the people can have no remedy; but the 4th section provides a remedy, a controlling power in a legislature, composed of senators and representatives of twelve states, without the influence of our commotions and factions, who will hear impartially, and preserve and restore

---

[21] *Ibid.*

[22] *Id.*, at 50–51.

[23] *Id.*, at 51.

to the people their equal and sacred rights of election. Perhaps it then will be objected, that from the supposed opposition of interests in the federal legislature, they may never agree upon any regulations; but regulations necessary for the interests of the people can never be opposed to the interests of either of the branches of the federal legislature; because that the interests of the people require that the mutual powers of that legislature should be preserved unimpaired, in order to balance the government. Indeed, if the Congress could never agree on any regulations, then certainly no objection to the 4th section can remain; for *the regulations introduced by the state legislatures will be the governing rule of elections, until Congress can agree upon alterations.*" [24] (Emphasis added.)

In the New York convention, during the discussion of § 4, Mr. Jones objected to congressional power to regulate elections because such power "might be so construed as to deprive the states of an essential right, which, in the true design of the Constitution, was to be reserved to them." [25] He proposed a resolution explaining that Congress had such power only if a state legislature neglected or refused or was unable to regulate elections itself. [26] Mr. Smith proposed to add to the resolution ". . . that each state shall be divided into as many districts as the representatives it is entitled to, and that each representative shall be chosen by a majority of votes." [27] He stated that his proposal was designed to prevent elections at large, which might result in all the representatives being "taken from a small part of the state." [28]

[24] *Id.,* at 26–27.
[25] *Id.,* at 325.
[26] *Id.,* at 325–326.
[27] *Id.,* at 327.
[28] *Ibid.*

He explained further that his proposal was not intended to impose a requirement on the other States but "to enable the states to act their discretion, without the control of Congress." [29]  After further discussion of districting, the proposed resolution was modified to read as follows:

> "[Resolved] . . . that nothing in this Constitution shall be construed to prevent the legislature of any state to pass laws, from time to time, to divide such state into as many convenient districts as the state shall be entitled to elect representatives for Congress, nor to prevent such legislature from making provision, that the electors in each district shall choose a citizen of the United States, who shall have been an inhabitant of the district, for the term of one year immediately preceding the time of his election, for one of the representatives of such state." [30]

Despite this careful, advertent attention to the problem of congressional districting, Art. I, § 2, was never mentioned.  Equally significant is the fact that the proposed resolution expressly empowering the States to establish congressional districts contains no mention of a requirement that the districts be equal in population.

In the Virginia convention, during the discussion of § 4, Madison again stated unequivocally that he looked solely to that section to prevent unequal districting:

> ". . . [I]t was thought that the regulation of time, place, and manner, of electing the representatives, should be uniform throughout the continent.  Some states might regulate the elections on the principles of equality, and others might regulate them otherwise.  This diversity would be obviously unjust. Elections are regulated now unequally in some states, particularly South Carolina, with respect to Charles-

---

[29] *Id.*, at 328.
[30] *Id.*, at 329.

ton, which is represented by thirty members. Should the people of any state by any means be deprived of the right of suffrage, it was judged proper that it should be remedied by the general government. *It was found impossible to fix the time, place, and manner, of the election of representatives, in the Constitution. It was found necessary to leave the regulation of these, in the first place, to the state governments, as being best acquainted with the situation of the people, subject to the control of the general government, in order to enable it to produce uniformity, and prevent its own dissolution.* And, considering the state governments and general government as distinct bodies, acting in different and independent capacities for the people, it was thought the particular regulations should be submitted to the former, and the general regulations to the latter. Were they exclusively under the control of the state governments, the general government might easily be dissolved. But if they be regulated properly by the state legislatures, the congressional control will very probably never be exercised. The power appears to me satisfactory, and as unlikely to be abused as any part of the Constitution." [31] (Emphasis added.)

Despite the apparent fear that § 4 would be abused, no one suggested that it could safely be deleted because § 2 made it unnecessary.

In the North Carolina convention, again during discussion of § 4, Mr. Steele pointed out that the state legislatures had the initial power to regulate elections, and that the North Carolina legislature would regulate the first election at least "as they think proper." [32] Respond-

---

[31] III Elliot's Debates 367.

[32] IV Elliot's Debates 71.

ing to the suggestion that *the Congress* would favor the seacoast, he asserted that the courts would not uphold nor the people obey "laws inconsistent with the Constitution." [33] (The particular possibilities that Steele had in mind were apparently that Congress might attempt to prescribe the qualifications for electors or "to make the place of elections inconvenient." [34]) Steele was concerned with the danger of *congressional* usurpation, under the authority of § 4, of power *belonging to the States.* Section 2 was not mentioned.

In the Pennsylvania convention, James Wilson described Art. I, § 4, as placing "into the hands of the state legislatures" the power to regulate elections, but retaining for Congress "self-preserving power" to make regulations lest "the general government . . . lie prostrate at the mercy of the legislatures of the several states." [35] Without such power, Wilson stated, the state governments might "make improper regulations" or "make no regulations at all." [36] Section 2 was not mentioned.

Neither of the numbers of The Federalist from which the Court quotes, *ante,* pp. 15, 18, fairly supports its holding. In No. 57, Madison merely stated his assumption that Philadelphia's population would entitle it to two Representatives in answering the argument that congressional constituencies would be too large for good government.[37] In No. 54, he discussed the inclusion of slaves in the basis of apportionment. He said: "It is agreed on all sides, that numbers are the best scale of wealth and taxation, as they are the only proper scale of representation." [38] This statement was offered simply to show that the slave

---

[33] *Ibid.*

[34] *Ibid.*

[35] II Elliot's Debates 440–441.

[36] *Id.,* at 441.

[37] The Federalist, No. 57 (Cooke ed. 1961), 389.

[38] *Id.,* at 368.

population could not reasonably be included in the basis of apportionment of direct taxes and excluded from the basis of apportionment of representation. Further on in the same number of The Federalist, Madison pointed out the fundamental cleavage which Article I made between apportionment of Representatives among the States and the selection of Representatives within each State:

"It is a fundamental principle of the proposed Constitution, that as the aggregate number of representatives allotted to the several States, is to be determined by a fœderal rule founded on the aggregate number of inhabitants, so the right of choosing this allotted number in each State is to be exercised by such part of the inhabitants, as the State itself may designate. The qualifications on which the right of suffrage depend, are not perhaps the same in any two States. In some of the States the difference is very material. In every State, a certain proportion of inhabitants are deprived of this right by the Constitution of the State, who will be included in the census by which the Fœderal Constitution apportions the representatives. In this point of view, the southern States might retort the complaint, by insisting, that the principle laid down by the Convention required that no regard should be had to the policy of particular States towards their own inhabitants; and consequently, that the slaves as inhabitants should have been admitted into the census according to their full number, in like manner with other inhabitants, who by the policy of other States, are not admitted to all the rights of citizens."[39]

In The Federalist, No. 59, Hamilton discussed the provision of § 4 for regulation of elections. He justified Congress' power with the "plain proposition, that *every*

---

[39] *Id.*, at 369.

*government ought to contain in itself the means of its own preservation."* [40]  Further on, he said:

"It will not be alledged that an election law could have been framed and inserted into the Constitution, which would have been always applicable to every probable change in the situation of the country; and it will therefore not be denied that a discretionary power over elections ought to exist somewhere. *It will, I presume, be as readily conceded, that there were only three ways, in which this power could have been reasonably modified and disposed, that it must either have been lodged wholly in the National Legislature, or wholly in the State Legislatures, or primarily in the latter, and ultimately in the former. The last mode has with reason been preferred by the Convention.*  They have submitted the regulation of elections for the Fœderal Government in the first instance to the local administrations; which in ordinary cases, and when no improper views prevail, may be both more convenient and more satisfactory; but they have reserved to the national authority a right to interpose, *whenever extraordinary circumstances might render that interposition necessary to its safety."* [41]  (Emphasis added.)

Thus, in the number of The Federalist which does discuss the regulation of elections, the view is unequivocally stated that the state legislatures have plenary power over the conduct of congressional elections subject only to such regulations as Congress itself might provide.

---

The upshot of all this is that the language of Art. I, §§ 2 and 4, the surrounding text, and the relevant history

[40] *Id.,* at 398.
[41] *Id.,* at 398–399.

are all in strong and consistent direct contradiction of the Court's holding. The constitutional scheme vests in the States plenary power to regulate the conduct of elections for Representatives, and, in order to protect the Federal Government, provides for congressional supervision of the States' exercise of their power. Within this scheme, the appellants do not have the right which they assert, in the absence of provision for equal districts by the Georgia Legislature or the Congress. The constitutional right which the Court creates is manufactured out of whole cloth.

## IV.

The unstated premise of the Court's conclusion quite obviously is that the Congress has not dealt, and the Court believes it will not deal, with the problem of congressional apportionment in accordance with what the Court believes to be sound political principles. Laying aside for the moment the validity of such a consideration as a factor in constitutional interpretation, it becomes relevant to examine the history of congressional action under Art. I, § 4. This history reveals that the Court is not simply undertaking to exercise a power which the Constitution reserves to the Congress; it is also overruling congressional judgment.

Congress exercised its power to regulate elections for the House of Representatives for the first time in 1842, when it provided that Representatives from States "entitled to more than one Representative" should be elected by districts of contiguous territory, "no one district electing more than one Representative." [42] The requirement was later dropped,[43] and reinstated.[44] In 1872, Congress required that Representatives "be elected by districts composed of contiguous territory, and containing as

---

[42] Act of June 25, 1842, § 2, 5 Stat. 491.

[43] Act of May 23, 1850, 9 Stat. 428.

[44] Act of July 14, 1862, 12 Stat. 572.

nearly as practicable an equal number of inhabitants, . . . no one district electing more than one Representative." [45] This provision for equal districts which the Court exactly duplicates in effect, was carried forward in each subsequent apportionment statute through 1911.[46] There was no reapportionment following the 1920 census. The provision for equally populated districts was dropped in 1929,[47] and has not been revived, although the 1929 provisions for apportionment have twice been amended and, in 1941, were made generally applicable to subsequent censuses and apportionments.[48]

The legislative history of the 1929 Act is carefully reviewed in *Wood* v. *Broom*, 287 U. S. 1. As there stated:

"It was manifestly the intention of the Congress not to re-enact the provision as to compactness, contiguity, and equality in population with respect to the districts to be created pursuant to the reapportionment under the Act of 1929.

"This appears from the terms of the act, and its legislative history shows that the omission was deliberate. The question was up, and considered." 287 U. S., at 7.

Although there is little discussion of the reasons for omitting the requirement of equally populated districts, the fact that such a provision was included in the bill as it was presented to the House,[49] and was deleted by the House after debate and notice of intention to do so,[50]

---

[45] Act of Feb. 2, 1872, § 2, 17 Stat. 28.

[46] Act of Feb. 25, 1882, § 3, 22 Stat. 5, 6; Act of Feb. 7, 1891, § 3, 26 Stat. 735; Act of Jan. 16, 1901, § 3, 31 Stat. 733, 734; Act of Aug. 8, 1911, § 3, 37 Stat. 13, 14.

[47] Act of June 18, 1929, 46 Stat. 21.

[48] Act of Apr. 25, 1940, 54 Stat. 162; Act of Nov. 15, 1941, 55 Stat. 761.

[49] H. R. 11725, 70th Cong., 1st Sess., introduced on Mar. 3, 1928, 69 Cong. Rec. 4054.

[50] 70 Cong. Rec. 1499, 1584, 1602, 1604.

leaves no doubt that the omission was deliberate. The likely explanation for the omission is suggested by a remark on the floor of the House that "the States ought to have their own way of making up their apportionment when they know the number of Congressmen they are going to have." [51]

Debates over apportionment in subsequent Congresses are generally unhelpful to explain the continued rejection of such a requirement; there are some intimations that the feeling that districting was a matter exclusively for the States persisted.[52] Bills which would have imposed on the States a requirement of equally or nearly equally populated districts were regularly introduced in the House.[53] None of them became law.

---

[51] 70 Cong. Rec. 1499 (remarks of Mr. Dickinson). The Congressional Record reports that this statement was followed by applause. At another point in the debates, Representative Lozier stated that Congress lacked "power to determine in what manner the several States exercise their sovereign rights in selecting their Representatives in Congress . . . ." 70 Cong. Rec. 1496. See also the remarks of Mr. Graham. *Ibid.*

[52] See, *e. g.*, 86 Cong. Rec. 4368 (remarks of Mr. Rankin), 4369 (remarks of Mr. McLeod), 4371 (remarks of Mr. McLeod); 87 Cong. Rec. 1081 (remarks of Mr. Moser).

[53] H. R. 4820, 76th Cong., 1st Sess.; H. R. 5099, 76th Cong., 1st Sess.; H. R. 2648, 82d Cong., 1st Sess.; H. R. 6428, 83d Cong., 1st Sess.; H. R. 111, 85th Cong., 1st Sess.; H. R. 814, 85th Cong., 1st Sess.; H. R. 8266, 86th Cong., 1st Sess.; H. R. 73, 86th Cong., 1st Sess.; H. R. 575, 86th Cong., 1st Sess.; H. R. 841; 87th Cong., 1st Sess.

Typical of recent proposed legislation is H. R. 841, 87th Cong., 1st Sess., which amends 2 U. S. C. § 2a to provide:

"(c) Each State entitled to more than one Representative in Congress under the apportionment provided in subsection (a) of this section, shall establish for each Representative a district composed of contiguous and compact territory, and the number of inhabitants contained within any district so established shall not vary more than 10 per centum from the number obtained by dividing the total population of such States, as established in the last decennial

For a period of about 50 years, therefore, Congress, by repeated legislative act, imposed on the States the requirement that congressional districts be equal in population. (This, of course, is the very requirement which the Court now declares to have been constitutionally required of the States all along without implementing legislation.) Subsequently, after giving express attention to the problem, Congress eliminated that requirement, with the intention of permitting the States to find their own solutions. Since then, despite repeated efforts to obtain congressional action again, Congress has continued to leave the problem and its solution to the States. It cannot be contended, therefore, that the Court's decision today fills a gap left by the Congress. On the contrary, the Court substitutes its own judgment for that of the Congress.

## V.

The extent to which the Court departs from accepted principles of adjudication is further evidenced by the irrelevance to today's issue of the cases on which the Court relies.

*Ex parte Yarbrough,* 110 U. S. 651, was a *habeas corpus* proceeding, in which the Court sustained the validity of a conviction of a group of persons charged with violating federal statutes [54] which made it a crime to conspire to deprive a citizen of his federal rights, and in particular the *right to vote.* The issue before the Court was whether or not the Congress had power to pass laws pro-

census, by the number of Representatives apportioned to such State under the provisions of subsection (a) of this section.

"(d) Any Representative elected to the Congress from a district which does not conform to the requirements set forth in subsection (c) of this section shall be denied his seat in the House of Representatives and the Clerk of the House shall refuse his credentials."

Similar bills introduced in the current Congress are H. R. 1128, H. R. 2836, H. R. 4340, and H. R. 7343, 88th Cong., 1st Sess.

[54] R. S. § 5508; R. S. § 5520.

tecting the right to vote for a member of Congress from fraud and violence; the Court relied expressly on Art. I, § 4, in sustaining this power. *Id.,* at 660. Only in this context, in order to establish that the right to vote in a congressional election was a right protected by federal law, did the Court hold that the right was dependent on the Constitution and not on the law of the States. Indeed, the Court recognized that the Constitution "adopts the qualification" furnished by the States "as the qualification of its own electors for members of Congress." *Id.,* at 663. Each of the other three cases cited by the Court, *ante,* p. 17, similarly involved acts which were prosecuted as violations of federal statutes. The acts in question were filing false election returns, *United States* v. *Mosley,* 238 U. S. 383, alteration of ballots and false certification of votes, *United States* v. *Classic,* 313 U. S. 299, and stuffing the ballot box, *United States* v. *Saylor,* 322 U. S. 385. None of those cases has the slightest bearing on the present situation.[55]

---

[55] *Smiley* v. *Holm,* 285 U. S. 355, and its two companion cases, *Koenig* v. *Flynn,* 285 U. S. 375; *Carroll* v. *Becker,* 285 U. S. 380, on which my Brother CLARK relies in his separate opinion, *ante,* pp. 18–19, are equally irrelevant. *Smiley* v. *Holm* presented two questions: the first, answered in the negative, was whether the provision in Art. I, § 4, which empowered the "Legislature" of a State to prescribe the regulations for congressional elections meant that a State could not by law provide for a Governor's veto over such regulations as had been prescribed by the legislature. The second question, which concerned two congressional apportionment measures, was whether the Act of June 18, 1929, 46 Stat. 21, had repealed certain provisions of the Act of Aug. 8, 1911, 37 Stat. 13. In answering this question, the Court was concerned to *carry out the intention of Congress in enacting the 1929 Act.* See *id.,* at 374. Quite obviously, therefore, *Smiley* v. *Holm* does *not* stand for the proposition which my Brother CLARK derives from it. There was not the slightest intimation in that case that Congress' power to prescribe regulations for elections was subject to judicial scrutiny, *ante,* p. 18, such that this Court could itself prescribe regulations for congressional elec-

The Court gives scant attention, and that not on the merits, to *Colegrove* v. *Green,* 328 U. S. 549, which is directly in point; the Court there affirmed dismissal of a complaint alleging that "by reason of subsequent changes in population the Congressional districts for the election of Representatives in the Congress created by the Illinois Laws of 1901 . . . lacked compactness of territory and approximate equality of population." *Id.,* at 550–551. Leaving to another day the question of what *Baker* v. *Carr,* 369 U. S. 186, did actually decide, it can hardly be maintained on the authority of *Baker* or anything else, that the Court does not today invalidate Mr. Justice Frankfurter's eminently correct statement in *Colegrove* that "the Constitution has conferred upon Congress exclusive authority to secure fair representation by the States in the popular House . . . . If Congress failed in exercising its powers, whereby standards of fairness are offended, the remedy ultimately lies with the people." 328 U. S., at 554. The problem was described by Mr. Justice Frankfurter as "an aspect of government from which the judiciary, in view of what is involved, has been excluded by the clear intention of the Constitution . . . ." *Ibid.* Mr. Justice Frankfurter did not, of course, speak for a majority of the Court in *Colegrove;* but refusal for that reason to give the opinion precedential effect does not justify refusal to give appropriate attention to the views there expressed.[56]

---

tions in disregard and even in contradiction of congressional purpose. The companion cases to *Smiley* v. *Holm* presented no different issues and were decided wholly on the basis of the decision in that case.

[56] The Court relies in part on *Baker* v. *Carr, supra,* to immunize its present decision from the force of *Colegrove.* But nothing in *Baker* is contradictory to the view that, political question and other objections to "justiciability" aside, the Constitution vests exclusive authority to deal with the problem of this case in the state legislatures and the Congress.

## VI.

Today's decision has portents for our society and the Court itself which should be recognized. This is not a case in which the Court vindicates the kind of individual rights that are assured by the Due Process Clause of the Fourteenth Amendment, whose "vague contours," *Rochin v. California,* 342 U. S. 165, 170, of course leave much room for constitutional developments necessitated by changing conditions in a dynamic society. Nor is this a case in which an emergent set of facts requires the Court to frame new principles to protect recognized constitutional rights. The claim for judicial relief in this case strikes at one of the fundamental doctrines of our system of government, the separation of powers. In upholding that claim, the Court attempts to effect reforms in a field which the Constitution, as plainly as can be, has committed exclusively to the political process.

This Court, no less than all other branches of the Government, is bound by the Constitution. The Constitution does not confer on the Court blanket authority to step into every situation where the political branch may be thought to have fallen short. The stability of this institution ultimately depends not only upon its being alert to keep the other branches of government within constitutional bounds but equally upon recognition of the limitations on the Court's own functions in the constitutional system.

What is done today saps the political process. The promise of judicial intervention in matters of this sort cannot but encourage popular inertia in efforts for political reform through the political process, with the inevitable result that the process is itself weakened. By yielding to the demand for a judicial remedy in this instance, the Court in my view does a disservice both to itself and to the broader values of our system of government.

Believing that the complaint fails to disclose a constitutional claim, I would affirm the judgment below dismissing the complaint.

## APPENDIX TO OPINION OF MR. JUSTICE HARLAN.*

| State and Number of Representatives** | Largest District | Smallest District | Difference Between Largest and Smallest Districts |
|---|---|---|---|
| Alabama (8) | ....... | ....... | ....... |
| Alaska (1) | ....... | ....... | ....... |
| Arizona (3) | 663,510 | 198,236 | 465,274 |
| Arkansas (4) | 575,385 | 332,844 | 242,541 |
| California (38) | 588,933 | 301,872 | 287,061 |
| Colorado (4) | 653,954 | 195,551 | 458,403 |
| Connecticut (6) | 689,555 | 318,942 | 370,613 |
| Delaware (1) | ....... | ....... | ....... |
| Florida (12) | 660,345 | 237,235 | 423,110 |
| Georgia (10) | 823,680 | 272,154 | 551,526 |
| Hawaii (2) | ....... | ....... | ....... |
| Idaho (2) | 409,949 | 257,242 | 152,707 |
| Illinois (24) | 552,582 | 278,703 | 273,879 |
| Indiana (11) | 697,567 | 290,596 | 406,971 |
| Iowa (7) | 442,406 | 353,156 | 89,250 |
| Kansas (5) | 539,592 | 373,583 | 166,009 |
| Kentucky (7) | 610,947 | 350,839 | 260,108 |
| Louisiana (8) | 536,029 | 263,850 | 272,179 |
| Maine (2) | 505,465 | 463,800 | 41,665 |
| Maryland (8) | 711,045 | 243,570 | 467,475 |
| Massachusetts (12) | 478,962 | 376,336 | 102,626 |
| Michigan (19) | 802,994 | 177,431 | 625,563 |
| Minnesota (8) | 482,872 | 375,475 | 107,397 |
| Mississippi (5) | 608,441 | 295,072 | 313,369 |

*The populations of the districts are based on the 1960 Census. The districts are those used in the election of the current 88th Congress. The populations of the districts are available in the biographical section of the Congressional Directory, 88th Cong., 2d Sess.

**435 in all.

| State and Number of Representatives | Largest District | Smallest District | Difference Between Largest and Smallest Districts |
|---|---|---|---|
| Missouri (10) | 506,854 | 378,499 | 128,355 |
| Montana (2) | 400,573 | 274,194 | 126,379 |
| Nebraska (3) | 530,507 | 404,695 | 125,812 |
| Nevada (1) | ....... | ....... | ....... |
| New Hampshire (2) | 331,818 | 275,103 | 56,715 |
| New Jersey (15) | 585,586 | 255,165 | 330,421 |
| New Mexico (2) | ....... | ....... | ....... |
| New York (41) | 471,001 | 350,186 | 120,815 |
| North Carolina (11) | 491,461 | 277,861 | 213,600 |
| North Dakota (2) | 333,290 | 299,156 | 34,134 |
| Ohio (24) | 726,156 | 236,288 | 489,868 |
| Oklahoma (6) | 552,863 | 227,692 | 325,171 |
| Oregon (4) | 522,813 | 265,164 | 257,649 |
| Pennsylvania (27) | 553,154 | 303,026 | 250,128 |
| Rhode Island (2) | 459,706 | 399,782 | 59,924 |
| South Carolina (6) | 531,555 | 302,235 | 229,320 |
| South Dakota (2) | 497,669 | 182,845 | 314,824 |
| Tennessee (9) | 627,019 | 223,387 | 403,632 |
| Texas (23) | 951,527 | 216,371 | 735,156 |
| Utah (2) | 572,654 | 317,973 | 254,681 |
| Vermont (1) | ....... | ....... | ....... |
| Virginia (10) | 539,618 | 312,890 | 226,728 |
| Washington (7) | 510,512 | 342,540 | 167,972 |
| West Virginia (5) | 422,046 | 303,098 | 118,948 |
| Wisconsin (10) | 530,316 | 236,870 | 293,446 |
| Wyoming (1) | ....... | ....... | ....... |

MR. JUSTICE STEWART.

I think it is established that "this Court has power to afford relief in a case of this type as against the objection that the issues are not justiciable,"* and I cannot subscribe to any possible implication to the contrary which

---

*The quotation is from Mr. Justice Rutledge's concurring opinion in *Colegrove* v. *Green,* 328 U. S., at 565.

may lurk in MR. JUSTICE HARLAN's dissenting opinion. With this single qualification I join the dissent because I think MR. JUSTICE HARLAN has unanswerably demonstrated that Art. I, § 2, of the Constitution gives no mandate to this Court or to any court to ordain that congressional districts within each State must be equal in population.