SOUTH CAROLINA STATE CONFER-
ENCE OF BRANCHES OF the NA-
TIONAL ASSOCIATION FOR the AD-
VANCEMENT OF COLORED PEOPLE,
INC., and William F. Gibson, its Presi-
dent, Adele Thompson Adams, Carol
Camellia Singletary, Rev. George R.
Couser, Robert S. Logan, Madie Robin-
son, Frank B. Washington, David I. Lu-
cas, and S. T. Peden, Plaintiffs,

v.

Honorable Richard D. RILEY, Governor of
the State of South Carolina, Nancy Ste-
venson, Lieutenant Governor of the
State of South Carolina, Presiding Offi-
cer and President of the Senate, L. Mar-
ion Gressette, President Pro-Tempore of
the Senate and Chairman of the Senate
Judiciary Committee, Raymond
Schwartz, Jr., Speaker of the House,
Robert J. Sheheen, Chairman of the
House Judiciary Committee of the State
of South Carolina, and James Ellisor,
Elections Commissioner for the State of
South Carolina, Defendants.

Richard Patrick OWENS, a resident of the
County of Hampton, and Henry D.
Prickett, a resident of the County of
Greenville, Plaintiffs,

v.

Richard W. RILEY, Governor of the State
of South Carolina, Nancy Stevenson,
Lieutenant Governor of the State of
South Carolina and Presiding Officer of
the Senate, Ramon Schwartz, Jr., Speak-
er of the South Carolina House of Rep-
resentatives, and James B. Ellisor, Exec-
utive Director of the Elections Commis-
sion for the State of South Carolina,
Defendants.

Civ. A. Nos. 81-2287-6, 81-2493-0.

United States District Court,
D. South Carolina,
Columbia Division.

Argued Feb. 11, 1982.

Decided March 8, 1982.

Thomas I. Atkins, Margaret Ford, New York City, Michael F. Talley, Talley & Lewis, Greenville, S. C., John B. Duggan, Edwards, Duggan & Reese, P. A., Greer, S. C., for plaintiffs.

Elmer W. Hatcher, Jr., Aiken, S. C., for H. A. McClearen.

Henry H. Taylor, West Columbia, S. C., for S. C. Republican Party.

Daniel R. McLeod, Atty. Gen., C. Tolbert Goolsby, Deputy Atty. Gen., Treva G. Ashworth, Senior Asst. Atty. Gen., James M. Holly, Asst. Atty. Gen., Preston B. Haines, III, Isabel W. Smith, Randell T. Bell, Robert E. Stepp, Columbia, S. C., for defendants.

Before HAYNSWORTH, Senior Circuit Judge, RUSSELL, Circuit Judge, and SIMONS, Chief Judge for the District of South Carolina.

## PER CURIAM.

For many months the two houses of the South Carolina legislature wrestled with the problem of congressional redistricting on the basis of the 1980 census data. Plans acceptable to one of the houses, however, were not acceptable to the other. Conceiving themselves to be hopelessly deadlocked, they abandoned the attempt to reach agreement with the expectation that this court would adopt a redistricting plan for the State.

## I.

No one contends the 1970 congressional districting plan may be continued. Between the 1970 and 1980 censuses, there were population shifts and disparate growth rates so that the 1970 plan would have impermissibly high variances on the basis of the 1980 census data. All parties before the court are thus agreed that this court must adopt a new congressional redistricting plan for South Carolina. That we will do, but with the distinct qualification that, if a different congressional districting plan is lawfully enacted, it may be placed in effect in lieu of the court's plan, provided it meets federal constitutional requirements and is in place in time to permit orderly functioning of the electoral process in the first election to which it is to be applied.

## II.

Two separate cases have been consolidated for hearing and disposition. One of them was brought by the South Carolina State Conference of Branches of the National Association for the Advancement of Colored People and some of its officials. It was brought against the Governor, the Lieutenant Governor, the chairman of the Senate Judiciary Committee and the President Pro Tempore of the Senate, the Speaker of the House of Representatives, the Chairman of the Judiciary Committee of the House, and the Executive Director of the Elections Commission of the State of South Carolina. The other was brought by Richard Patrick Owens and Henry D. Prickett, in their capacities as individual voters, against some of the same defendants.[1]

The parties have presented a number of plans for consideration by the court. The NAACP plaintiffs have submitted three

---

1. A number of defendants have filed motions to dismiss. We do not consider those motions of the legislative defendants, for no relief will be granted as to them. The motion of the Executive Director of the Elections Commission is denied, for it is he who will have primary responsibility for the implementation and execution of our order. Our order will also run against the Governor and Lieutenant Governor insofar as they may be involved in the execution of the election laws, including compliance with our direction.

plans, though they principally urge adoption of one of two plans which would create a Sixth District with a majority of black residents. The Owens plaintiffs have submitted the "Eagle Plan," so called because its Second District resembles an eagle with wings widespread and its tail, neck and head outstretched. They also have submitted a modified Eagle Plan, with a very low variance achieved by crossing county lines to pick up or drop pockets of people. The defendants from the House of Representatives have submitted a plan enacted by the House, and they urge its adoption by the court. The Senate defendants have laid upon the table a number of plans, only one of which, the 3.44% plan which is discussed later, was ever enacted by either house. They do not urge us to adopt any one of them, but invite our attention to them solely for the purpose of showing that district boundaries may be drawn to produce tolerable variances without violating county lines.

### III.

We take our direction from a set of principles which should guide us.

■ A. First, and most important, is the requirement of *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.* at 7–8, 84 S.Ct. at 529–30. We will thus confine our consideration to plans with low population variances. There are several plans before us with maximum variances of less than 1%, still more with maximum variances of less than 2%. The higher the variance, of course, the stronger must be the reasons for departure from near perfect equality.

■ B. The State has a substantial interest in the preservation of county lines in the congressional redistricting process, as long as that can be done without violation of the principle of *Wesberry v. Sanders* and consistently with other State interests. *See White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973). Indeed, the Senate defendants insist that the South Carolina Constitution requires of the legislature strict adherence to county lines in drawing congressional districts.

■ Article VII, § 13 of the South Carolina Constitution of 1895 provides:

The General Assembly may at any time arrange the various Counties into Judicial Circuits, and into Congressional Districts . . . as it may deem wise and proper . . . .

The provision is permissive, not mandatory, though the Senate defendants would find in it an implicit prohibition against subdivision of any county. With respect to that, one may say that there should be little doubt that the members of the constitutional convention of 1895 did not foresee the Supreme Court's holding in *Wesberry v. Sanders* and the problems that would be engendered by required decennial redistricting. Probably no one thought of the possibility of a division of a county between two congressional districts, and, if one had thought of it, the answer probably would have been that it should not be done unless there was good reason for it.

This is a question, however, which we may not address authoritatively. Only the Supreme Court of South Carolina may do that. Clearly, however, South Carolina's constitutional provision addresses the powers of the legislature. It has nothing to do with the power of this court, and it is relevant to our decision only insofar as it may be read as an expression of a general state policy against dividing counties in the course of congressional redistricting.

We recognize, however, that there is a substantial state policy favoring drawing congressional districts along county boundaries. This is so because the residents of a county have a community of interest. They are accustomed to voting together for county officials. There is much administrative convenience in drawing district lines along county lines, and it facilitates the process of organizing constituencies and campaigning for the support of constituents.

■ C. Any new plan should alter the old only insofar as necessary to obtain an

acceptable result. Incumbents know their constituents in the old districts, and many of those constituents will know their congressman as "my congressman." Many of the constituents would have been served by the congressman in ways calculated to obtain and enhance loyal support. Such voters ought not to be deprived of the opportunity to vote for a candidate that has served them well in the past and to enjoy his continued representation of them. Supporters and opponents, alike, have a basis for judging him. This consideration, of course, must give way to the requirement of *Wesberry v. Sanders*, but great alterations of the old districts should not be undertaken if lesser change will achieve the desired result. *See White v. Weiser, supra*, at 797, 93 S.Ct. at 2355.

D. Certain adjoining counties have a special community of interest, for metropolitan areas overflow county boundaries. This is true of Greenville and Spartanburg and of Richland and Lexington, for metropolitan Columbia's growth in Lexington County has been large and vigorous. It is also true of Charleston, Berkeley and Dorchester. Metropolitan Charleston's area includes portions of both Berkeley and Dorchester, and the three counties together support and run a joint Chamber of Commerce. *See David v. Cahill*, 342 F.Supp. 463, 469 (D.N.J.1972).

E. The districts should be as compact as reasonably possible. *See Dunnell v. Austin*, 344 F.Supp. 210, 215 (E.D.Mich. 1972).

F. We must be careful that district boundaries are not gerrymandered to dilute the voting strength of minorities. *See Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). A court should approach the problem with racial neutrality but with care to be assured that no unfairness to any race is inadvertently perpetrated.

G. Finally, we must give some weight to the fact that the plan adopted by the House has substantial political support. No other plan with an acceptable variance has been adopted by either house or enjoys any ascertainable degree of political acceptance.

Perhaps no plan may fully serve all of these purposes, but each should be judged with these considerations in mind.

IV.

The House plan achieves a thoroughly acceptable maximum variance of 0.28%.

The changes to achieve that result involve only six of the forty-six counties. Barnwell and Allendale are moved from the Second District to the Third. Newberry County is moved from the Third District to the Fifth, while Union County is moved from the Fifth to the Fourth, and Lee County is moved from the Sixth to the Fifth.

Berkeley County is divided. Most of the populous Goose Creek-Hanahan Division of Berkeley County, a part of metropolitan Charleston in which approximately 54,000 people reside, is placed with Charleston in the First District, while the much larger, though more rural area of the county, containing about 40,000 people, is placed in the Sixth District.

The House plan substantially preserves intact the metropolitan centers which are thought to be best left together. Greenville and Spartanburg remain in the Fourth, Richland and Lexington remain in the Second, while Charleston and Dorchester, and most of that portion of Berkeley County which may be regarded as part of the Charleston metropolitan area, remain in the First.

The House plan does not reduce the black population of any district by as much as 1%. That population is reduced by .9% in the First District, by .8% in the Second, and by .4% in the Sixth, but there are reciprocal increases of 1% in the Third District, of .7% in the Fourth, and of .2% in the Fifth.

The only discernible objection to the House plan is the division of Berkeley County.

One of the plans submitted on behalf of the Senate defendants, though its adoption is not urged, has a maximum variance

of .73%, substantially higher than the .28% of the House plan. The districts are organized entirely along county lines, but to achieve that result eighteen counties are moved from one district to another. Greenville and Spartanburg are divided, and Berkeley County is entirely separated from Charleston and placed in the Sixth District, although it is substantially surrounded by a revised First District.

Another plan submitted by counsel for the Senate defendants would achieve a maximum variance of .98%. The division is entirely along county lines, but Richland and Lexington are separated, as are Charleston and Dorchester. The Second District, into which the Fifth deeply penetrates, could hardly be called compact. Thirteen counties would be transferred out of their present districts.

Counsel for the Senate defendants have submitted other plans with maximum variances ranging from 1.48% to 2.37%. The boundaries are entirely along county lines, but they achieve their results by radical rearrangement of the counties. In the 1.48% plan, for instance, the First District gives up Hampton, Jasper, Beaufort, Colleton and Dorchester but picks up Georgetown and Horry Counties. The Second District would lose Barnwell, Allendale, Bamberg, Orangeburg, Richland and Calhoun Counties, but would acquire Saluda, Newberry, Laurens, Abbeville, Anderson, Oconee and Pickens Counties. The Third District would lose Oconee, Pickens, Anderson, Abbeville, Saluda and Newberry Counties, but would pick up Barnwell, Allendale, Bamberg, Orangeburg, Calhoun, Hampton, Colleton, Jasper, Dorchester and Beaufort Counties. The Fifth District would lose Union County to the Fourth, and Chesterfield, Kershaw and Sumter to the Sixth, while picking up Richland County. The Sixth District would lose Horry and Georgetown to the First, while picking up Sumter, Kershaw and Chesterfield.

As we have indicated, neither the Senate itself nor either of the Senate defendants has endorsed any of the plans submitted to us by their lawyers. They are simply illus-

trations of the fact that the district lines can be drawn with strict adherence to county lines, but they are also demonstrations of the fact that the cost is very large, since they bear little resemblance to the present districts. In addition, the population variances in all of the plans exceed the population variance in the House plan.

The last plan actually considered favorably by the Senate has a maximum variance of 3.44%, and it has a Third District extending from the mountain ridges, along which the border with North Carolina runs, to the Atlantic Ocean.

The Eagle Plan has a maximum variance of 1.55%, and separates Richland and Lexington Counties and Charleston and Dorchester Counties. Moreover, it would transfer ten counties from one district to another. The residencies of two incumbents would be placed in the same district.

At oral argument, counsel for the Owens plaintiffs submitted a modified Eagle Plan. It is identical to the first except that in four instances it crosses county lines to pick up small groups of persons and move them from one district to another. By such moves it achieves a maximum variance of only 0.0656%, but the separation of Richland and Lexington Counties and Charleston and Dorchester Counties remain. Moreover, crossing county lines in four instances for the purpose of transferring relatively small groups of people from one district to another seems unacceptable.

The NAACP plaintiffs have tendered three plans with maximum variances of 0.66%, 1.50% and 2.61%. The rearrangement of the counties is radical, many counties are split, and the population variances are higher than the one in the House plan. In the 0.66% plan, Colleton, Dorchester, Berkeley, Williamsburg, Marion, Darlington, Richland, Anderson, Florence, Orangeburg and York are each divided between two districts. The 1.50% plan divides Anderson, York, Richland, Darlington, Florence, Berkeley, Dorchester and Colleton Counties.

## V.

 From these brief descriptions of suggested plans, it should be apparent that the most acceptable one is the House 0.28% plan. It more satisfactorily meets every consideration identified as relevant to our decision, except for the division of Berkeley County. A division of one county is not an inconsiderable objection, but it seems to us far less weighty than the extensive and radical rearrangement of the counties or the great increase in the maximum variances that strict adherence to the boundaries of all forty-six counties requires. Moreover, that division is not simply a move to pick up or exclude people, but is drawn roughly along the borders of metropolitan Charleston with which the people in the lower part of Berkeley County do have a community of interest.

We are not entirely satisfied, however, with the precise location of the line dividing Berkeley County. In part it runs through a Naval facility upon which people are housed, and the exact line through it is yet to be located upon the basis of a population count yet to be made. To the extent that it is feasible, the line there and elsewhere should run along precinct lines so that all of the residents of each precinct may use one ballot for congressional races. Counsel will be requested to make further inquiry as to that, and to report back to the Court.

We have considered all of the suggested plans. We have not attempted to develop one of our own. The likelihood that we could produce one better than the House 0.28% plan is so slight an attempt is unwarranted. The time for campaigning is almost at hand; an effort to develop a court alternative would take weeks if not months. As soon as possible candidates should know the boundaries of their districts, and the voters their choice of candidates.

## VI.

An order will be entered requiring the House 0.28% plan to be placed in effect, subject to modification of the line dividing Berkeley County. That plan will remain in effect for all congressional elections through 1990, unless South Carolina enacts its own plan which will meet federal constitutional requirements. To that end, the South Carolina legislature is free to proceed at any time, and to place in effect a lawfully enacted plan, provided only that the plan is in place a sufficient time before the first election to which it is to be applied to permit the orderly functioning of the electoral process.