Miguel DeGRANDY, Mario Diaz–Balart, Andy Ireland, Casimer Smericki, Van B. Poole, Terry Ketchel, Roberto Casas, Rodolfo Garcia, Jr., Luis Rojas, Lincoln Diaz–Balart, Javier Souto, Justo Luis Poso, Alberto Cardenas, Rey Velazquez, Luis Morse, Alberto Gutman, Karen E. Butler, Sgt. Augusta Carter, Jean Van Meter, Anna M. Pinellas, Robert Woody, Gina Hahn, Bill Petersen, Terry Kester, Margie Kincaid, and Brooks White, Plaintiffs,

v.

T.K. WETHERELL, in his official capacity as Speaker of the Florida House of Representatives, Gwen Margolis, in her official capacity as President of the Florida Senate, Lawton Chiles, in his official capacity as Governor of the State of Florida, Jack Gordon, in his official capacity as Chairman of the Senate Reapportionment Committee, Peter R. Wallace, in his official capacity as Chairman of the House Reapportionment Committee, Jim Smith, in his official capacity as Secretary of State of Florida, Robert Butterworth, in his official capacity as Attorney General of Florida, Defendants.

FLORIDA STATE CONFERENCE OF NAACP BRANCHES, T.H. Poole, Sr., Whitfield Jenkins, Leon W. Russell, Willye Dennis, Turner Clayton, Rufus Brooks, Victor Hart, Kerna Iles, Roosevelt Walters, Johnnie McMillian,

Phyllis Berry, Mary A. Pearson, Mable Butler, Iris Wilson, Jeff Whigham, Al Davis, Peggy Demon, Carlton Moore, Richard Powell, Neil Adams, Leslie McDermott, Robert Saunders, Sr., Irv Minney, Ada Moore, Anita Davis, and Calvin Barnes, Plaintiffs,

v.

Lawton CHILES, in his official capacity as Governor of Florida, Jim Smith, in his official capacity as Secretary of State of Florida, Robert Butterworth, in his official capacity as Attorney General of Florida, Gwen Margolis, in her official capacity as President of the Florida Senate, T.K. Wetherell, in his official capacity as Speaker of the Florida House of Representatives, Jack Gordon, in his official capacity as Chairperson of the House Reapportionment Committee, and Peter R. Wallace, in his official capacity as Chairman of the House Reapportionment Committee, Defendants.

No. TCA 92–40015–WS.
Civ. A. No. 92–40131.

United States District Court,
N.D. Florida,
Tallahassee Division.

May 29, 1992.

**1078**

E. Thom Rumberger, Rumberger, Kirk & Caldwell, Orlando, Fla., George N. Meros, Jr., Rumberger, Kirk & Caldwell, Tallahassee, Fla., for DeGrandy.

Mark S. Levine, Tallahassee, Fla., for Simon Ferro.

George L. Waas, Denis Dean, Asst. Atty. Gen., Department of Legal Affairs, Tallahassee, Fla., for T.K. Wetherell.

James A. Peters, Cobb, Cole & Bell, Tallahassee, Fla., for Wetherell & Wallace.

F. Perry Odom, Joseph C. Jacobs, Ervin, Varn, Jacobs, Odom & Ervin, Tallahassee, Fla., for Andy Ireland.

Craig T. James, pro se.

Alberto Gutman, pro se.

Donald M. Middlebrooks, Steel, Hector & Davis, Miami, Fla., for Jim Bacchus.

Edwin I. Ford, Largo, Fla., for George C. McGough et al.

Richard E. Doran, Asst. Deputy Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for Chiles & Butterworth.

Sidney L. Matthew, Gorman & Matthew, P.A., Tallahassee, Fla., for Florida AFL-CIO.

Halley B. Lewis, pro se.

Daniel J. Webster, pro se.

W. Douglas Moody, Jr., Stephen N. Zack, Senate Committee on Reapportionment, Mark Herron, Mitchell D. Franks, Akerman, Senterfitt, Eidson & Moffitt, Tallahassee, Fla., for Margolis.

Parker D. Thomson, Carol A. Licko, Miami, Fla., H. Lee Moffitt, Akerman, Senterfitt, Eidson & Moffitt, Tallahassee, Fla., for Proffer as Special Master.

Stephen N. Zack, Miami, Fla., for Margolis & Gordon.

Aurora Ares, Thornton, David, Murray, Richard & Davis, P.A., Miami, Fla., for Cuban American Bar Ass'n.

Larry White, Tallahassee, Fla., Frank R. Parker, Brenda Wright, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for Gwen Humphrey, et al.

Charles G. Burr, Tampa, Fla., Harry L. Lamb, Jr., Perry & Lamb, P.A., Orlando, Fla., Dennis Courtland Hayes, Willie Abrams, NAACP Special Contribution Fund, Baltimore, Md., for Florida State Conference of NAACP Branches.

Henry C. Hunter, Charles E. Vanture, Tallahassee, Fla., Rodney G. Gregory, Rodney G. Gregory, P.A., Jacksonville, Fla., for Reaves, Brown & Hargarett.

Edwin J. Turanchik, Zinober & McCrea, Tampa, Fla., for Gwen Margolis.

Katharine Inglis Butler, University of South Carolina Law School, Columbia, S.C., for AFL-CIO.

Before HATCHETT, Circuit Judge, and STAFFORD and VINSON, District Judges.

## OPINION

BY THE COURT.

Florida currently has nineteen members in its congressional delegation. According to the 1990 federal decennial census, increases in Florida's population entitle Florida to four additional members in the United States House of Representatives. Thus, the number in Florida's congressional delegation has increased to twenty-three.

According to the 1990 census data, the total population of the state of Florida is 12,937,926 persons. Between the census of 1980 and the census of 1990, Florida's population increased 3,213,602 persons. To achieve equality between Florida's twenty-three districts, each district would ideally contain 562,518.5 persons. Seven Florida counties have a population greater than the

ideal population of 562,518.5 persons. Those counties are: Broward, Dade, Duval, Hillsborough, Orange, Palm Beach, and Pinellas.

A longstanding general history of official discrimination against minorities has influenced Florida's electoral process. In 1885, Article VI, Section 8 of the Florida Constitution imposed a poll tax which disenfranchised poor minority voters. Additionally, Article XII, Section 12 of the 1885 Florida Constitution segregated African–American and white school children. Article XVI, Section 24 of that same Florida Constitution also outlawed the intermarriage of white with African–Americans. As recently as 1967, § 350.20, Fla.Stat. provided in part: "The Florida Public Service Commissioners may prescribe reasonable rules and regulations relating to the separation of white and colored passengers in passenger cars being operated in this state by any railroad company or other common carrier." Additionally, § 1.01(6), Fla.Stat. (1967) provided that "the words 'Negro,' 'colored,' 'colored persons,' 'mulatto,' or 'persons of color,' when applied to persons, include every person having one-eighth or more of African or Negro blood." Federal precedent has also addressed numerous recent discriminatory election practices in Florida, including at-large election schemes, white primaries, majority vote requirements, and candidate filing fees. Such official state discrimination has adversely affected the ability of minorities to participate in the political process.

The parties agree that racially polarized voting exists throughout Florida to varying degrees. The results of Florida's legislative elections over the past ten years established the presence of racially polarized voting. *See In re Constitutionality of Senate Joint Resolution 2G, Special Apportionment Session 1992*, 597 So.2d 276, 287–93 (Fla.1992) (Chief Justice Shaw, dissenting). In areas such as education, employment and health care, Florida's minorities have borne the effects of discrimination. The 1990 census figures demonstrate that among persons sixteen years or older, African–Americans are more than twice as likely to be unemployed as whites. In Florida, the poverty rate for African–Americans is more than three times higher than the rate for whites. Additionally, we note that voting studies have consistently indicated the strong relationship between socio-economic status and political participation. Thus, the legal barriers and the economic barriers which the legacy of racism has created in the state of Florida, have prevented African–Americans from fully participating in the political process.

In the state of Florida, minorities have had very little success in being elected to either the United States Congress or the Florida Legislature. An African–American has not represented Florida in the United States Congress in over a century. In addition, only one Hispanic congressperson serves from Florida. From 1889 until 1968, African–Americans were unable to elect a single representative to the state house. Additionally, African–Americans were unable to elect a representative to the state senate until ten years ago. Until four years ago, no Hispanic state senator had ever been elected in Florida. *See In re Constitutionality of Senate Joint Resolution 2G*, No. 79–674 at 34–37 (Chief Justice Shaw, dissenting).

As a result of Florida's past discrimination practices, the United States Justice Department must preclear five Florida counties pursuant to Section 5 of the Voting Rights Act, as amended. *See* 42 U.S.C. § 1973 *et seq.* Those counties are: Collier, Hardee, Hendry, Hillsborough, and Monroe. The Florida Constitution does not provide a method for congressional redistricting if the state legislature fails to pass a redistricting plan, or the United States Justice Department fails to preclear a plan the state legislature adopted.

Pursuant to the Florida Statutes, candidates seeking federal office in Florida must qualify between July 6 and July 10, 1992. The first primary election is scheduled to occur on September 1, 1992. The general election is scheduled to occur on November 3, 1992. Given this set of circumstances, the plaintiffs filed the following action.

## PROCEDURAL BACKGROUND

On the opening day of the 1992 Florida legislative session, Miguel DeGrandy, a member of the Florida House of Representatives, and other registered voters ("DeGrandy plaintiffs") filed a complaint against the Speaker of the Florida House of Representatives, the President of the Florida Senate, the Governor of Florida, and other state officials. The DeGrandy plaintiffs filed the complaint in the District Court for the Northern District of Florida challenging the constitutionality of Florida's current congressional and state legislative districts. The DeGrandy plaintiffs alleged that the current districts violate both the Equal Protection Clause of the United States Constitution and the Voting Rights Act of 1965, as amended, and urged this court to assert jurisdiction in order to redistrict and reapportion the state.[1] *See* 42 U.S.C. § 1973 *et seq.*

The DeGrandy plaintiffs filed a first amended complaint on January 23, 1992. The defendants moved to dismiss the complaint. After hearing arguments on the motion, the court dismissed the action due to lack of subject matter jurisdiction. On March 9, 1992, the DeGrandy plaintiffs filed a second amended complaint. On March 13, 1992, the Florida Legislature ended its regular session without adopting either a congressional redistricting or a state reapportionment plan.

Subsequently, on March 27, 1992, this three-judge court convened and denied all motions to dismiss and established an expedited scheduling order to adopt congressional and state legislative plans by May 29, 1992. This scheduling order in no way enjoined or prevented state redistricting and reapportionment agencies from attempting to enact their own plans. When this court issued the expedited scheduling order, however, we were concerned that the state legislature would be unable to pass a congressional redistricting plan and have the Justice Department preclear that plan in time for the scheduled candidate qualification date of July 6, 1992. This court was particularly concerned that minority voters would not be able to participate meaningfully in the political process and adequately decide on a candidate of their choice given the time constraints of the redistricting process. The absence of a meaningful opportunity for minorities to participate in the political process and elect a candidate of their choice constitutes a violation of section 2 of the Voting Rights Act. Further, none of the parties presented evidence or testimony to this court indicating that the Florida legislature would convene and adopt a congressional redistricting plan in time for the July 6 qualifying date.

In fact, on April 2, 1992, the Governor of Florida, Lawton Chiles, called a special redistricting and reapportionment session of the Florida Legislature pursuant to Article III, Section 16, of the Florida Constitution. While the legislature could not agree on a congressional redistricting plan, it did adopt Senate Joint Resolution 2G reapportioning state House and Senate districts.

Meanwhile, this case progressed and the court consolidated with it a similar lawsuit that the Florida State Conference of the NAACP Branches and many individual African–American voters filed on April 7, 1992. The court also granted many persons and organizations leave to intervene or act as amicus curiae. Those acting as amici are: Simon Ferro, State Chairman of the Florida Democratic Party; Common Cause; Florida AFL–CIO; United States Representative Craig James; The Cuban American Bar Association; The Coalition of Hispanic Women; and State Representative Daniel Webster. Plaintiff-intervenors include: Gwen Humphrey; State Representative Darryl Reaves; United States Representative Jim Bacchus; and United States Representative Andy Ireland. State Representative Alzo Reddick is a defendant-intervenor.

---

**1.** In this order, the term "redistricting" refers to the process of drawing new congressional districts, while the term "reapportionment" describes the process of redistributing state house and senate seats. *See* Bryant, Giddings & Kaplan, *"Partisan Gerrymandering" A New Concern for Florida's 1992 Reapportionment,* 19 Fla.St. U.L.Rev. 265, 265 n. 3 (1991).

In order to facilitate taking evidence concerning the many proposed congressional plans, the court appointed The Honorable C. Clyde Atkins, Senior United States District Judge, Southern District of Florida on April 6, 1992, to serve as Special Master. The court charged the Special Master with the task of considering and evaluating congressional redistricting and legislative reapportionment plans for Florida in a short period of time.

Subsequently, on April 17, 1992, Robert Butterworth, the Attorney General of the State of Florida, submitted Senate Joint Resolution 2–G concerning state legislative reapportionment to the United States Justice Department for preclearance pursuant to Section 5 of the Voting Rights Act. That same day, this court issued an order bifurcating the congressional redistricting and state reapportionment hearings and setting an amended schedule. The parties stipulated that Florida's current congressional district lines are malapportioned. We held on April 30, 1992, that Florida's existing congressional plan is unconstitutional. On May 13, 1992, the Florida Supreme Court validated Senate Joint Resolution 2G. As a result of the validation, this court stayed proceedings related to state reapportionment.

Meanwhile, on April 24, 1992, the Special Master appointed Professor M. David Gelfand as an Independent Expert and instructed him to consider and evaluate the redistricting plans proposed. Additionally, the Special Master charged the Independent Expert with either recommending one of the parties's plans, or formulating one himself. The Special Master conducted a full week of hearings in which he accepted plans into evidence and heard expert testimony concerning the proposed redistricting plans. Ultimately, on May 14, 1992, Professor Gelfand submitted his report to the Special Master in which he recommended for adoption Independent Expert Plan 308, a combination of several plans the parties submitted.

On May 15, 1992, the parties cross-examined Professor Gelfand concerning his proposed redistricting plan. The Special Master then conducted an evaluation of the plans and submitted his report to this court on May 18, 1992. The Special Master recommended Independent Expert Plan 308.

This court held a hearing on May 27, 1992, to hear the parties' objections to the Special Master's report. Having considered all the evidence submitted concerning Florida's congressional redistricting, the court adopts the Special Master's findings of fact and conclusions of law. The court notes that the Special Master did an outstanding job of analyzing the evidence and testimony, recommending a plan that will enable minorities to participate in Florida's electoral politics and to elect candidates of their choice. For his effort, this court is grateful. We emphasize, however, that the Special Master did not have final approval of the redistricting of Florida. After many hours of study, this court independently determined that the Special Master's recommended plan should be adopted, which we now call the 1992 Florida Redistricting Plan.[2]

The remainder of this order is divided into seven parts. Part I summarizes the law the court applies in this case. Part II evaluates the plans the parties submitted. Part III contains a discussion of the expert witnesses' proposed plan. Part IV summarizes objections made to the Special Master's Report. Part V expressly incorporates the Special Master's and Independent Expert's Reports. Part VI contains this court's conclusions regarding the congressional redistricting plans. Lastly, Part VII certifies that the 1992 Florida Redistricting Plan is a final judgment pursuant to rule 54(b).

**2.** See Appendix A (map of the adopted plan); Appendix B (accompanying curative rules regarding contiguity); Appendix C (Special Master's Report and accompanying attachments, including the Independent Expert's Report. Note, however, that Independent Expert's Exhibits 2A, 2B, and 3 are not attached to this Order. Independent Expert's Exhibits 2A and 2B, the Technical Plan Descriptions, are attached to the Judgment). [Editor's Note: Appendices and Attachments referred to here and throughout the opinion and judgment order are omitted from publication.]

## I. LEGAL PRINCIPLES

### The Voting Rights Act

The Voting Rights Act arose as a remedy to racially discriminatory election practices, particularly in the South. Enactment of the Fifteenth Amendment after the Civil War eliminated many statutory obstacles to African–American voting. Nonetheless, state and local officials soon utilized impediments to voter registration as a means of denying African–Americans the right to vote. In the early 1960s, the United States Justice Department challenged the use of literacy tests in voter registration on a case-by-case basis. Because this approach proved ineffective, Congress passed the Voting Rights Act in 1965. *See* S.Rep. No. 417, 97th Cong., 2d Sess. 27 (1982) (Senate Report on 1982 amendments to the Voting Rights Act), *reprinted in* 1982 U.S.C.C.A.N. 177 [hereinafter "Senate Report"]. As Senator Jacob Javits stated, the purpose of the Voting Rights Act was "not only to correct an active history of discrimination, the denying to [African–Americans] of the right to register and vote, but also to deal with the accumulation of discrimination.... The bill would attempt to do something about accumulated wrongs and a continuance of the wrongs." Senate Report at 182.

The two central provisions of the Voting Rights Act are section 2 and section 5. Section 2 forbids any "state or political subdivision" from imposing or applying any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color," or membership in a language minority. 42 U.S.C. § 1973(a). Section 5 contains the requirement that any change in voting qualifications, prerequisites, standards, practices, or procedures of certain covered states or political subdivisions must be "precleared" by the United States Justice Department. The Justice Department will only preclear plans that are not discriminatory in purpose and effect. *See* 42 U.S.C. 1973c.

### 1982 Amendments

Pre–1980, the Supreme Court held that plaintiffs could prevail in Voting Rights Act suits by establishing that a challenged law or procedure resulted in denying a racial or language minority equal participation in the electoral process. Under this result-oriented test, the court looked at the totality of the circumstances surrounding the local electoral process to determine whether a Voting Rights Act violation occurred. It was unnecessary, however, for a plaintiff to show that the challenged law or procedure was either designed or maintained to effectuate a discriminatory purpose.

In *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a plurality of the Supreme Court increased the plaintiff's burden of proof in Voting Rights Act cases by requiring plaintiffs to prove a discriminatory intent on the part of the legislators who enacted the challenged laws or procedures. Congress found this new burden of proof unacceptably difficult for Voting Rights Act plaintiffs and amended section 2 in 1982. *See* Pub.L. No. 97–205, 96 Stat. 131, 134 (1982). The amendment allowed plaintiffs to prove section 2 violations by demonstrating that minorities were denied an equal chance to participate in the electoral process based on the totality of the circumstances. Thus, Congress essentially codified the result-oriented test used in pre-*Bolden* cases. The amendment specifically provided, however, that it was not to be read to require proportionate representation. Plaintiffs demonstrate a violation of the Act only when equal access to the political process has been denied.

■ To determine whether minorities have an equal opportunity to participate in the political process and to select candidates of their choice, the Senate Report accompanying the amended section 2 delineated several objective factors that should be considered. These objective factors include:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right

of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; 2. the extent to which voting in the election of the state or political subdivision is racially polarized; 3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; 4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process; 5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; 6. whether political campaigns have been characterized by overt or subtle racial appeals; 7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. And whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*See* Senate Report at 206–07 (citing *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973)). Under the 1982 amendment to section 2, a plaintiff may prove a violation of the Act if a proposed redistricting plan dilutes minority voting strength. *See Jeffers v. Clinton,*

730 F.Supp. 196, 204 (E.D.Ark.1989), *aff'd* — U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991); *Jordan v. Winter,* 604 F.Supp. 807, 811–12 (N.D.Miss.1984).

The Supreme Court first applied the 1982 amendment in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In *Gingles,* plaintiffs challenged existing multi-member state legislative districts. The Court held that plaintiffs must prove three threshold criteria when challenging an at-large system: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the minority's preferred candidate is usually defeated by white bloc voting. *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766.

*Gingles,* while helpful, is not dispositive of this case because this case does not involve a traditional section 2 challenge to an existing plan. *See In re Constitutionality of Senate Joint Resolution 2G, Special Apportionment Session 1992,* 597 So.2d 276, 278–79, 288 (Fla.1992) (Shaw, C.J., dissenting). Although the absence of an existing plan prevents the court from engaging in the factually intensive analysis of a traditional section 2 challenge, this court must consider in crafting the redistricting plan the section 2 requirement of ensuring that the plan does not dilute the votes of racial or language minorities. The Supreme Court has held that "it is imperative for the district court, in drawing up a new plan, to make every effort not only to comply with the established constitutional standards, but also to allay suspicion and avoid the creation of concerns that might lead to new constitutional challenges." *Connor v. Finch,* 431 U.S. 407, 425, 97 S.Ct. 1828, 1839, 52 L.Ed.2d 465 (1977).

*Court-ordered Plans*

■ While it is the duty of the legislature to redistrict the state, when the legislature is unable to adopt a redistricting plan, the obligation of devising a redistricting scheme falls upon the courts. *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). Two primary

factors guide this court in evaluating proposed redistricting plans: (1) population equality (one person-one vote); and (2) the racial fairness of the plan. *See Hastert v. State Bd. of Elections,* 777 F.Supp. 634 (N.D.Ill.1991); *Major v. Treen,* 574 F.Supp. 325, 342 n. 22 (E.D.La.1983).

■ To satisfy the one person-one vote requirement, this court must draw the state's congressional districts so that their populations are equal. *See Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (interpreting U.S. Constitution, art. I, sec. 2). In drawing Florida's congressional districts, this court must seek to avoid *de minimis* deviations from exact population equality unless the deviations are necessary to achieve some critical state objective. *See Karcher v. Daggett,* 462 U.S. 725, 730, 103 S.Ct. 2653, 2658, 77 L.Ed.2d 133 (1983) (rejecting deviation of less than .07 percent); *Kirkpatrick v. Preisler,* 394 U.S. 526, 531, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969) (only those population variances "which are unavoidable despite a good faith effort to achieve absolute equality or for which justification is shown" will be accepted). Because several plans have been introduced in this case bearing a minimum deviation of one person or .000177 percent, this court must adopt a plan which meets this standard unless greater deviation is necessary to ensure racial fairness. *See Hastert,* 777 F.Supp. at 644.

■ In analyzing the racial fairness factor, the voting age population (VAP) is the relevant number to be used in determining whether minorities in a particular district will be able to elect a candidate of their choice. *See Solomon v. Liberty County,* 899 F.2d 1012, 1018 (11th Cir.1990) (*en banc*), *cert. denied,* — U.S. —, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991). Further, because Hispanic communities are characterized by a large number of noncitizens and lower voter registration rates, a super majority of the VAP is necessary to create districts in which Hispanics can elect candidates of their choice. This court must ensure that a court-imposed plan does not

dilute the votes of racial or language minorities. *See* Senate Report at 204.

■ This court should also consider issues of possible retrogression affecting the five Florida counties which come under the protection of section 5 of the Voting Rights Act. Although the Supreme Court has held in *McDaniel v. Sanchez,* 452 U.S. 130, 138, 101 S.Ct. 2224, 2230, 68 L.Ed.2d 724 (1981), that court-ordered congressional redistricting plans need not be precleared, the court should consider whether the changes proposed in a redistricting plan make members of racial or language minorities in the five protected counties worse off than they were before the change in terms of their ability to participate effectively in the electoral process. *See Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976); *see also City of Lockhart v. United States,* 460 U.S. 125, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983).

■ In addition to the constitutional requirement of one person-one vote and the statutory requirements of section 2 and section 5 of the Voting Rights Act, the court has considered the following permissive criteria in evaluating redistricting plans: contiguity, compactness, respect for traditional boundaries, maintaining communities of interest, and party competitiveness. Under Florida law, a "district lacks contiguity only when a part is isolated from the rest by the territory of a another district." *In re Apportionment Law,* 414 So.2d 1040, 1051 (Fla.1982). Although no federal or state requirement that congressional districts be contiguous exists, contiguity is appropriate. *See Dunnell v. Austin,* 344 F.Supp. 210, 215 (E.D.Mich.1972); *David v. Cahill,* 342 F.Supp. 463, 469 (D.N.J.1972). With regard to compactness, the district court in *Dillard v. Baldwin County Bd. of Education,* 686 F.Supp. 1459, 1466 (M.D.Ala.1988) correctly pointed out that

the degree of geographical symmetry or attractiveness is therefore a desirable consideration for districting but only to the extent it aids or facilitates the political process, and only as one among many considerations a court should include, the

principal one being section 2's vote dilution prohibition in determining whether there is sufficient compactness for a majority [minority] district.

*Dillard,* 686 F.Supp. at 1466. Thus, the proper focus of any geographic compactness analysis is upon the size and relative concentration of the minority population, rather than upon the size or shape of the district. Additionally, although respecting traditional county boundaries is a desirable approach, this aesthetic requirement should not undercut the primary goal of creating minority districts. The consideration of communities of interest is also relevant to the determination of compactness. If a district is so spread out that no sense of community exists, then that district is not sufficiently compact. *See Dillard,* 686 F.Supp. at 1466. However, members of a minority group who live in separate enclaves may still be included in a single district where it can be shown that they constitute a single community having similar interests. *See Hastert,* 777 F.Supp. at 649. Finally, maintaining party competitiveness in Florida's congressional districts is an important goal because Florida has developed into a strong two-party state.

## II. EVALUATING THE PLANS UNDER THE GUIDELINES

### General Considerations

Like the Special Master, we conclude that "the law supports the drawing of a minority district where, in light of minority concentrations and community of interests, such a district can reasonably be drawn." Report of the Special Master at 14. All the proposed congressional redistricting plans contain at least one African–American VAP district and two Hispanic super majority VAP districts. Thus, the inquiry becomes whether a second African–American VAP district is necessary, and whether African–American "influence" districts should also be included in the plan.

 The parties and the *amici curiae* take two different approaches to the creation of African–American districts. On the one hand, four of the proposed plans create two African–American districts with a VAP majority. On the other hand, several of the plans create only one African–American district with a VAP majority, but also create two or three other districts with respectable African–American voting age populations. These districts, with substantial minority concentrations comprising less than fifty percent of the VAP, are commonly referred to as influence districts. Proponents of the plans which include influence districts argue that it is more desirable for African–Americans to have influence in several districts rather than constituting a majority in only two districts.

We believe the second approach, which fractures the African–American community into influence districts, would merely continue the past dilution of minority voting strength. Where, in a statewide redistricting case such as the present one, this court can reasonably draw a majority-minority district, we cannot choose to create an influence district or districts. *Compare Brooks v. Winter,* 461 U.S. 921, 103 S.Ct. 2077, 77 L.Ed.2d 291 (1983) (vacating three-judge court's influence district remedy and remanding for reconsideration in light of amendments to section 2) *with Mississippi Republican Executive Comm'n v. Brooks,* 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984) (affirming use of majority African–American district as remedy); *see also United States v. Dallas County Comm'n,* 850 F.2d 1433, 1439–42 (11th Cir.1988) (vacating district court's remedy, which included one at-large influence district, and adopting instead a plan which included five single-member districts, including two African–American districts, two white districts, and one African–American "swing" district), *cert. denied,* 490 U.S. 1030, 109 S.Ct. 1768, 104 L.Ed.2d 203 (1989). The approach of fracturing the African–American community in order to create influence districts does not further Congress's intent of completely remedying the prior dilution of minority voting strength and providing a meaningful opportunity to participate in the political process. *See* Senate Report *supra* at 208. It is not enough for minority groups to be able to influence elections because, under the Voting Rights Act, they

must be able to determine the outcome of elections and elect representatives of their choice. *See* 42 U.S.C. § 1973(b) (1982). As the Seventh Circuit noted, "[t]here is simply no point in providing minorities with a 'remedy' for the illegal deprivation of their representational rights in a form which will not in fact provide them with a realistic opportunity to elect a representative of their choice." *Ketchum v. Byrne*, 740 F.2d 1398, 1413 (7th Cir.1984).

*Specific Plans*

The Florida State Conference of NAACP Branches submitted a plan which contains two African–American voter age population majority districts. The NAACP plan also contains an African–American influence district and two Hispanic super majority districts. Although this approach is sound, the plan's deviation of 0.02 from absolute population equality makes it unacceptable as a court-ordered plan.

Gwen Margolis, President of the Florida Senate, submitted a plan which proposes two African–American majority districts and two super majority Hispanic districts. The weakness of the Margolis plan lies in its method of forming the two south Florida Hispanic districts. The plan creates the districts by combining Dade County Hispanic neighborhoods with areas in predominantly non-Hispanic adjacent counties. The division of Dade's Hispanic neighborhoods among five congressional districts seriously damages the community of interest of these neighborhoods. Additionally, the plan includes areas of high white growth in the Hispanic districts, reducing the likelihood that Hispanics will be able to elect candidates of their choice.

Congressman Andy Ireland submitted a plan which creates two African–American majority districts, one African–American influence district, and two super majority Hispanic districts. The Ireland plan's African–American majority district in central Florida is extremely long, irregularly shaped, and extends from Palm Beach County in south Florida to Volusia County in central Florida, and from St. Lucie County on the Atlantic Coast to Pinellas County on the Gulf Coast. This long, irregularly shaped district traverses parts of seventeen counties and involves three major media markets. The communities linked in this sprawling district are likely to have competing interests and do not constitute communities of interest. Additionally, the district contains several areas in which the rate of growth in the white community is expected to be large. Thus, it is doubtful that the African–American community will be able to maintain the 50.1 percent voter age population majority.

Congressman Craig T. James submitted a plan which provides for two African–American majority districts and no influence districts. The James plan creates two Hispanic super majority districts in Dade County. The basic thrust of the James plan was to maintain the present district structure where possible and to leave incumbent districts in tact. The plan's major deficiency is that it packs African–Americans into two strong majority districts but creates no influence districts.

Miguel DeGrandy, an Hispanic member of the Florida House of Representatives, sponsored a plan which establishes a single African–American majority VAP district, three African–American influence districts, and two Hispanic super majority VAP districts. The DeGrandy plan has several disadvantages. First, it provides for only one African–American majority VAP district. Second, the plan's sprawling influence district in central Florida links together populations in the Tampa and Orlando areas likely to have competing interests.

The Humphrey intervenors, a group of African–American citizens, sponsored a plan which is identical to the first plan sponsored by State Reps. Reeves, Brown, and Hargrett. Collectively, these plans are referred to as the Lawyer's Committee plans. The Lawyer's Committee plans form an African–American majority district in the south, with influence districts in the northern, central, and southern areas of the state. Additionally, the plans form two Hispanic super majority districts in the southern portion of the state. The Lawyer's Committee plans contain the same disadvantages as the DeGrandy plan, in

that they only provide for one African–American VAP majority district, while other plans have demonstrated that two or more are possible.

Common Cause, a national public advocacy group, sponsored a plan which contains one African–American super majority district, one African–American influence district, and two super majority Hispanic districts. Although the Common Cause plan achieves the minimum possible deviation from the requirement of one person-one vote, Common Cause's strict adherence to county boundaries prevented it from creating a second district with an African–American voter age population majority. This second African–American majority district, as other plans have demonstrated, can be created while still achieving the minimum deviation. Common Cause's demographer and expert admitted that the Common Cause plan was not the best plan and recognized that its principal shortcoming was its failure to create more minority districts.

T.K. Wetherell, Speaker of the Florida House of Representatives, submitted a plan which has one African–American VAP majority district, two African–American influence districts, and two Hispanic super majority districts. In drafting the Wetherell plan, members of the Florida House of Representatives placed policy considerations ahead of strictly legal ones. Thus, the plan elevates the secondary criteria of compactness, coherent communities of shared interest, and respect for traditional political boundaries over the primary principle of ensuring that minority voting strength is not diluted.

Jack Gordon, Chairman of the Florida Senate Committee on Reapportionment submitted a plan which creates one African–American and two Hispanic majority districts in south Florida. The Hispanic districts are nearly identical to the Hispanic districts in the Margolis plan. The Gordon plan, like the Margolis plan, decreases the access of Dade County Hispanics to the political process because it splits the His-

panic population among five congressional districts extending beyond Dade County. Additionally, the Gordon plan fails to draw a second African–American majority district.

State Rep. Alzo Reddick submitted a plan which creates one African–American majority district in south Florida, an African–American influence district in North Florida, and two Hispanic majority districts located primarily in Dade County. The Reddick plan minimizes the ability of minority groups, particularly African–Americans, to participate in the political process. Specifically, the Reddick plan creates only one African–American majority district and one African–American influence district with a small African–American voter age population of 36.3 percent.

Daniel Webster submitted a plan which creates only one African–American majority district and two Hispanic super majority districts. The Webster plan perpetuates the traditional dilution of African–American voting strength by keeping African–American voters submerged in heavily white districts.[3]

In light of the deficiencies of all of the plans, the expert witness proposed his own plan for the Special Master's consideration and adoption.

## III. EXPERT PLAN 308

The independent expert assembled his plan (Plan 308) from key portions of other plans, in particular the DeGrandy plan, the Common Cause plan, the Margolis plan, and the NAACP plan. The expert plan takes the NAACP and DeGrandy approach of creating two African–American majority districts, plus one influence African–American district. Additionally, the expert's plan follows the DeGrandy approach with some modification in south Florida, keeping Cuban–American communities together and creating two Hispanic super majority districts, plus one African–American majority district, in Dade County. The expert pointed out that his plan follows the lead of the

**3.** The AFL–CIO also submitted a plan, but withdrew the plan in light of its similarities to the

Reddick and Gordon plans.

Margolis plan with respect to the African–American majority district in north Florida. However, the plan makes changes in that district based upon the NAACP plan. Additionally, the expert witness points out that the plan generally follows the Common Cause approach to central Florida.

Districts 18 and 21 are the two super majority Hispanic districts in the expert's plan. District 18 has a Hispanic VAP of 67.5 percent, and District 21 has a Hispanic VAP of 70.6 percent. These are reasonable numbers for an effective Hispanic district. Districts 3 and 17 are the two African–American majority VAP districts in the expert's plan. District 17, in Dade County has a total African–American population of 58.4 percent, VAP of 54 percent, and registration of 59.3 percent. District 3 has an African–American total population of 55 percent, VAP of 50.6 percent, and registration of 50.6 percent. In addition, the expert's plan creates an African–American influence district, District 23, which has a substantial African–American voter age population of 45.7 percent.

In considering retrogression under section 5, we note that the expert's plan is a state-wide congressional redistricting plan in which the districts must all have the same population. Thus, no single district can be examined or changed in isolation. The expert's plan increases both Hispanic and African–American political representation when the Florida congressional delegation is considered as a whole. The minority populations of districts have shifted, so that minority populations are now lower in some districts and higher in others. Nevertheless, the plan overall substantially increases the level of political participation and electoral representation for the members of minority groups in Florida. Additionally, expert plan 308 is politically competitive.

## IV. OBJECTIONS

The DeGrandy plaintiffs "generally accept" the Special Master's plan. They contend, however, that the creation of two African–American influence districts in northern and central Florida under their plan better serves the purposes of the Voting Rights Act. They argue that African–Americans living in the Tampa Bay area and between Jacksonville and Tallahassee achieve a level of influence under the DeGrandy plan lacking under the Special Master's plan.

Plaintiff intervenors Reeves, Brown, and Hargrett agree that the Special Master's plan meets the requirements of the Constitution and the Voting Rights Act. They argue, however, that their own plan (212) is superior. Without explanation, they disagree with the Special Master's treatment of central Florida. In north Florida, they support the creation of a majority-minority district which includes African–Americans from Jackson County to Duval County.

Plaintiff intervenor Rep. Andy Ireland recognizes that the Special Master's plan meets the requirements of the U.S. Constitution and the Voting Rights Act. He contends, however, that the plan fails to meet certain neutral redistricting criteria. *See generally Arizonans for Fair Representation v. Symington*, No. Civ. 92–256–PHX–SMM (D.Ariz. April 30, 1992). Ireland proposes three changes to correct these errors. First, he argues that the borders of Districts 9, 5, and 12 should be modified so that relatively developed western Pasco County moves into District 9, while rural parts of Pasco County move into District 5. These minor adjustments will preserve communities of interest, one of the three neutral criteria mentioned in *Arizonans. See also Carstens v. Lamm*, 543 F.Supp. 68, 88 (D.Colo.1982). Second, Ireland proposes adjusting the borders of Districts 16, 22, and 23 to avoid the unnecessary "out-districting" of incumbent Rep. Tom Lewis. *See Arizonans*, slip op. at 7; *South Carolina State Conference Branches of NAACP v. Riley*, 533 F.Supp. 1178, 1180–81 (D.S.C.1982). Ireland's proposal would put Lewis's residence in District 16, the district most closely approximating his present district. Finally, Ireland proposes moving District 23 slightly to the west where it parallels District 22 in order to avoid splitting Boca Raton among three districts. Ireland contends that the court

can make all three of these changes without compromising the constitutional and statutory integrity of the Special Master's plan.

Defendants Margolis and Gordon criticize the Special Master's plan for creating an African–American influence district in south Florida. They contend that the Voting Rights Act does not require influence districts, and several courts have specifically rejected them. *See, e.g., McNeil v. Springfield Park Dist.*, 851 F.2d 937 (7th Cir.1988); *Turner v. Arkansas*, 784 F.Supp. 553 (E.D.Ark.1991). Margolis and Gordon argue that the independent expert relied upon insufficient evidence in concluding that District 23 would be an effective minority influence district. They further argue that the expert failed to account sufficiently for demographic trends in District 17, the African–American majority district in south Florida. According to Margolis and Gordon, Hispanic immigration into District 17 will overwhelm the black majority VAP by the end of the decade. Accordingly, Margolis and Gordon support the creation of a majority-minority district in south Florida with a sixty-two percent African–American VAP, as compared to the Special Master's majority-minority district with a fifty-four percent African–American VAP.[4] They would achieve this higher African–American VAP in the majority-minority district by eschewing a south Florida African–American influence district.

The Humphrey plaintiff intervenors contend that the Special Master's plan meets statutory and constitutional requirements. Much of their memorandum is devoted to defending the plan's treatment of south Florida against Margolis and Gordon's attack. The Humphrey intervenors argue that the Constitution and the Voting Rights Act require the creation of an African–American influence district in south Florida.[5] They further argue that any change in the Special Master's plan should be limited to increasing African–American representation in north and central Florida. They argue that their plan, creating two strong minority influence districts in those regions, is preferable to the Special Master's plan.[6]

The House defendants contend that the Special Master ignored the first requirement of the three-prong test in *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766. Specifically, the "grotesquely" shaped north Florida majority-minority district in the Special Master's plan (District 3) flaunts *Gingles*'s requirement that the African–American minority be "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766; *see also Jeffers*, 730 F.Supp. at 202 (applying *Gingles* test in single-member district case); *Turner v. Arkansas*, 784 F.Supp. 553, 568 (E.D.Ark.1991) (same). District 3 is a political unit incapable of meaningful representation and indicates that the Special Master improperly sought to achieve proportional representation, contrary to the provisions of the Voting Rights Act. In south Florida, the House defendants argue that the Special Master's plan inappropriately focuses upon the creation of Cuban–American districts, rather than Hispanic districts. The Voting Rights Act makes no such distinctions among language minority sub-groups. Contrastingly, the House defendants' plan would draw

---

4. Margolis argues that the Special Master's inclusion of black Hispanics in the African–American population figures for District 17 further overstates the African–American VAP for that district.

5. The Humphrey intervenors disagree with the characterization of District 23 as a mere "influence" district. Although the African–American VAP in District 23 is less than fifty percent, the evidence showed that African–Americans will have the opportunity to elect candidates of their choice in that district. Thus, African–Americans will have more than "influence" in District 23.

6. Again, the Humphrey intervenors are reluctant to characterize these districts as "influence" districts. Under the Humphrey intervenors' plan, Districts 3 and 7 would have African–American VAPs of 47.45 percent and 46.58 percent, respectively. According to Humphrey, the evidence showed that African–American voters in these north and central Florida districts would be able to elect the candidates of their choice.

two south Florida districts with Hispanic VAPs over sixty-five percent, without unnecessarily splintering Dade County's "Anglo, Jewish, and retirement" communities of interest. The House defendants further argue that the independent expert and Special Master inappropriately relied upon "party competitiveness" as the exclusive measure of fairness, ignoring other measures such as "political bias" and "seats votes/ratio" [sic]. Finally, the House defendants contend that the independent expert and Special Master chose a "separatist" interpretation of the Voting Rights Act. They warn this court against using the Voting Rights Act to promote "political apartheid." (Quoting *Burton v. Sheehan*, 793 F.Supp. 1329, 1356 n. 47.)

## V. INCORPORATION OF DOCUMENTS

We expressly incorporate the Special Master's and Independent Expert's Reports. *See* Appendix C. We also expressly incorporate into this order the curative rules regarding contiguity. *See* Appendix B.

## VI. CONCLUSION

▬ After careful study and review of controlling precedent, redistricting plans submitted to the court, the Special Masters Report with attachments, and objections to the Special Master's Report, including oral argument, this court declares the current congressional districts unconstitutional. Because the state of Florida does not have a scheme other than legislative passage of a congressional districting plan, the voters of Florida will suffer a deprivation of constitutional and statutory rights unless this court imposes a plan.

## VII. CERTIFICATE

Pursuant to Rule 54(b), Federal Rules of Civil Procedure, the court determines that there is not just reason for delay in entry of judgment regarding congressional redistricting. Accordingly, by separate judgment, as required by law, this court orders

the state of Florida to conduct the 1992 congressional elections and congressional elections thereafter in districts as shown by Plan 308, which this court deems the "1992 Florida Redistricting Plan."

## JUDGMENT

It is ordered, adjudged, and decreed as follows:

1. The state of Florida's current congressional districts, drawn in 1982, violate the plaintiffs' rights and the rights of all Florida citizens because the districts fail to meet the requirements of Article I, Section 2 of the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the one-person-one-vote principle, and the Voting Rights Act of 1965, as amended (42 U.S.C. § 1973);

2. The court adopts plan 308, the 1992 Florida Redistricting Plan, as the plan to be utilized in the 1992 Florida congressional elections and in Florida congressional elections thereafter;

3. The defendants, individually, and their successors, agents, employees, attorneys, and persons acting in concert or in participation with them shall;

(a) conduct congressional elections in 1992 in accordance with the redistricting plan this court has adopted called "The 1992 Florida Redistricting Plan," a map and written description of which are attached to this Judgment; *

(b) conduct congressional elections in years after 1992 in accordance with the 1992 Florida Redistricting Plan.

VINSON, District Judge, specially concurring.

I join in the opinion and judgment of this court. However, I have serious reservations about the geographic shape and form of some of the districts in the plan we adopt. For example, District 3, in north Florida, has the appearance of something lifted from a Rorschach test. It wanders, web-like, from south of Orlando through-

* [Editor's Note: The written description is not included for publication.]

out northeast Florida. [*See* testimony of Dr. Arrington, Tr. Vol. III, pp. 8, 79]. The reason for these odd shapes, of course, arises from taking several concentrations of minority population, which alone are not large enough to be the basis of a majority black or majority Hispanic district, and connecting them together in order to create such a district. The experts acknowledge that doing so, while advancing the political representation opportunities for racial and language minorities, sacrifices other important redistricting values. [*See, e.g.,* Dr. Arrington's testimony, Vol. III, pp. 8–11, 20–21, 38–42, 77–82]. No plan can be perfect, and the challenge is to try to reach a fair and equitable balance among the competing values.

The Voting Rights Act of 1965, as amended, prohibits any standard, practice, or procedure which acts "to deny or abridge the right of any citizen of the United States to vote on account of race or color ... [or] because he is a member of a language minority group." [18 U.S.C. §§ 1973, 1973b(f)(2) ]. As several of the parties have pointed out, "proportionality" [1] is not a requirement of Section 2 of the Voting Rights Act. [*See, e.g.,* Tr. Vol. III, pp. 40–41]. It is not our goal, therefore, under Section 2 of the Act to draw as many minority districts as possible. [Tr. Vol. III, p. 38]. But we should draw as many as can be reasonably done. Several of the plans proposed do not contain the geographic distortion evident in some of the districts. For example, the plan filed by the politically-neutral party, Common Cause,[2] maintains both compact districts and keeps fifty of Florida's sixty-seven county boundaries intact in crafting the congressional districts. [Tr. Vol. II, p. 247, et seq.]

In a slightly different context, the Supreme Court of the United States has recognized that Section 2's voting dilution prohibition applies to minority groups that are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles,* 478 U.S. 30, 50, 106 S.Ct. 2752, 2766, 92 L.Ed.2d 25 (1986). The parties have debated what, if anything, that standard of "geographically compact" means in the context of redistricting cases such as this one. Certainly, the decisions of the Supreme Court of the United States are the law of the land just as much as are the underlying statutes enacted by Congress. If the standard has any validity in this context, as I believe it does, then it must bear some relationship to what is objectively reasonable.[3] As the Special Master rightly observed: "I conclude that the law supports the drawing of a minority district where, in light of minority concentrations and community of interests, such a district can *reasonably* be drawn." [Sp. Master's Rpt., p. 14 (emphasis added) ].

When drawing districts to achieve majority voting status for minority populations, a court must keep in mind that the sword it uses is two-edged. It is, to be sure, creating a remedial district in order to provide better racial or language minority political participation opportunities, in accordance with the Section 2 goals and standards. However, at the same time, it is deliberately relegating another group of individuals within that district to minority voting status which, assuming polarized voting, may effectively negate that group's ability to elect candidates of its choice. We should,

---

**1.** See *Solomon v. Liberty County, Florida,* 899 F.2d 1012, 1036, n. 13 (special concurring opinion of C.J. Tjoflat) (11th Cir.1990, en banc).

**2.** As all the parties recognize, most of the plans submitted were slanted toward either Republican orientation or Democratic orientation, while the Common Cause posture was generally acknowledged to be politically neutral. Common Cause's expert witness, Dr. Arrington, pointed out in his testimony that newly-created districts having a majority of African-Americans can be expected to be one-party Democrat-

ic, while newly-created districts having a majority of Hispanic voters can be expected to be one-party Republican—at least as long as the present political orientations continue. [Tr. Vol. III, pp. 19–20].

**3.** "Compactness" does not seem to have an agreed-upon legal definition, but it can be calculated mathematically by dividing the area within the district by the distance around its perimeter.

therefore, be very careful in how we draw such districts.

Equally important, the "community of interests" represented within a congressional district encompasses not only individual interests, or interests of particular groups, but also interests associated with the communities in which they live, including the municipalities and counties. It remains to be seen whether those interests can be consistently and rationally represented in the democratic process when the district is itself comprised of a series of fractional enclaves from widely separated areas.

These odd-shaped districts will present administration difficulties. The census tracts utilized in drawing the districts overlap established voting precincts and will not easily jibe with other state and local district boundaries. They are disconnected from the traditional way we view the formation of such districts. They follow few recognized political boundaries. They will undoubtedly present campaigning problems for the candidates within those districts. Perhaps most importantly, I do not believe that these districts will make sense among the public. [*See, e.g.,* Tr. Vol. III, pp. 8, 38]. They appear to be something created by Gov. Elbridge Gerry.

Without some objective geographical compactness standard to evaluate districts, the potential for future abuse in crafting district boundaries is virtually unlimited. I believe the plan we adopt is fair and accomplishes what we are striving to do, but I would much prefer 23 districts which comply with some reasonable standard of compactness.